147 T.C. No. 15

UNITED STATES TAX COURT

ANALOG DEVICES, INC. & SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17380-12.                    Filed November 22, 2016.

P is a corporation that is a U.S. shareholder of a controlled
foreign corporation (CFC). P repatriated cash dividends from the
CFC and claimed an 85% I.R.C. sec. 965 dividends received
deduction (DRD) for 2005. P reported no related party indebtedness
during its testing period pursuant to I.R.C. sec. 965(b)(3) when it
claimed the DRD.

R determined, and P agreed, that the annual 2% royalty from
CFC to P should be increased to 6% for 2001-05 to reflect arm's-
length pricing. See I.R.C. sec. 482. In 2009 P and R executed a
closing agreement pursuant to Rev. Proc. 99-32, 1999-2 C.B. 296, to
effect the secondary adjustments required after a primary I.R.C. sec.
482 allocation. The closing agreement established accounts
receivable as described in Rev. Proc. 99-32, sec. 4.01, 1999-2 C.B. at
299, for 2001-05 and deemed them created as of the last day of the
taxable year to which they relate. R subsequently determined that the
accounts receivable constituted an increase in related party

indebtedness under sec. I.R.C. 965(b)(3) during P's testing period, which R determined decreased P's I.R.C. sec. 965 DRD.

Held: The parties did not reach an agreement in the closing agreement with respect to the treatment of the accounts receivable under I.R.C. sec. 965.

Held, further, I.R.C. sec. 965(b)(3) does not provide that the accounts receivable constituted related party indebtedness arising during P's testing period.

Held, further, the accounts receivable did not increase CFC's related party indebtedness during the testing period.

Held, further, P is entitled to the full amount of its claimed DRD.

Kenneth B. Clark, James P. Fuller, Jennifer L. Fuller, Andrew J. Kim, and Larissa B. Neumann, for petitioner.

Michele J. Gormley and Curt M. Rubin, for respondent.

OPINION

MARVEL, Chief Judge: Respondent determined deficiencies in petitioner's Federal income tax of $3,997,804 and $22,112,640 for taxable years 2006 and 2007, respectively. The issue for decision is whether the accounts receivable that the parties established in a 2009 closing agreement pursuant to Rev. Proc. 99-32,

1999-2 C.B. 296, created retroactive indebtedness between petitioner and its

controlled foreign corporation (CFC) under section 965(b)(3).[1]  If so, the amount

of petitioner's section 965(a) dividends received deduction (DRD) for 2005 would

be reduced.[2]

Background

The parties submitted this case fully stipulated under Rule 122.  The

stipulated facts and facts drawn from the stipulated exhibits are incorporated

herein by this reference.[3]  Petitioner is a U.S. corporation with its principal place

of business in Norwood, Massachusetts.

---

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code (Code) as amended and in effect for the years at issue, and all Rule
references are to the Tax Court Rules of Practice and Procedure.

[2]Although petitioner claimed the DRD for its 2005 taxable year, only the
2006-07 taxable years are before us because of credit carryovers.  The Court may
consider facts relating to tax years that are not otherwise within the Court's
jurisdiction where necessary to correctly redetermine the amounts of the tax
deficiencies for the years at issue.  See sec. 6214(b).  Petitioner's 2005-07 tax
years ended on October 29, 2005, October 28, 2006, and November 3, 2007,
respectively.

[3]Respondent reserved relevancy objections with respect to certain stipulated
facts.  To the extent that we include a stipulated fact subject to a relevancy
objection in the background section, we will discuss respondent's objection.
Stipulated facts not included in the background section do not inform our holding,
and objections to them are denied as moot.

Analog Devices, Inc. (petitioner), was founded in 1965. It is the common parent of a group of subsidiaries that joined in the timely filing of consolidated Federal income tax returns for the 2006-07 tax years. It is also the parent of nonconsolidated foreign affiliates.

Petitioner, its subsidiaries, and its affiliates design, develop, manufacture, and sell high-performance analog, mixed-signal, and digital signal processing integrated circuits. In 1976 petitioner incorporated Analog Devices B.V. (ADBV), which then built a fabrication facility of complementary metal oxide semiconductor technology. ADBV is organized under the laws of the Netherlands with its principal place of management and business in Limerick, Ireland. For all relevant times, petitioner owned 100% of the issued and outstanding shares of ADBV, which was a CFC pursuant to section 957(a).

I.   The Intercompany Royalty

In 1982, in connection with a section 482 adjustment, petitioner entered into a closing agreement with the Internal Revenue Service (IRS) Appeals Office establishing an annual royalty from ADBV to petitioner equal to 2% of ADBV's net sales.[4] ADBV paid the 2% royalty to petitioner every year through the end of

[4]Respondent objects to facts regarding the 1982 and 1995-96 transfer pricing adjustments and the 1998 license agreement, infra. Although we do not
(continued...)

petitioner's 1994 taxable year, at which time petitioner and ADBV concluded that the royalty was no longer necessary. After the IRS had conducted an audit and determined to reinstate the royalty, petitioner and ADBV entered into a cross-license agreement in 1998 (1998 license agreement) again reflecting a 2% royalty from ADBV to petitioner effective November 3, 1996. By its terms, the 1998 license agreement was valid for 20 years.

The IRS regularly conducted examinations for petitioner's tax years following the 1998 license agreement. In 2006 the IRS conducted an examination for petitioner's 2001-03 tax years. As a result of that examination, the IRS proposed under its authority pursuant to section 482 to increase the intercompany royalty to 6% beginning with the 2001 tax year. Petitioner's chief financial officer agreed to the proposed increase for 2001-03 by executing Form 4549, Income Tax Examination Changes, on May 22, 2006.

Petitioner filed an amended 2004 Federal income tax return on July 18, 2006, to reflect the increased royalty rate. Petitioner timely filed its 2005 Federal

[4](...continued)
base our holding on these transfer pricing adjustments, these facts provide context and useful background information. Respondent's objections with respect to this background information are overruled.

income tax return on July 13, 2006, and reported a 6% royalty from ADBV.[5]  For

2001-05 the total increase in petitioner's royalty income due to the application of a

6% royalty as opposed to a 2% royalty was $429,175,634 (additional royalty

amount).  The transfer pricing adjustments giving rise to the additional royalty

amount did not create indebtedness for Federal income tax purposes.

In July 2006 ADBV and petitioner credited and debited their respective

intercompany accounts by the royalty adjustment amount.  ADBV paid the

additional royalty amount in a series of payments to petitioner between July 25

and October 26, 2006.  Petitioner did not make an election under Rev. Proc. 99-32,

supra,[6] in 2006 with respect to the payments.

---

[5]Petitioner applied the 6% rate for 2004-05 before the IRS had concluded its examinations with respect to those years.  However, adjustments for those years were pending before the IRS at that time.

[6]Rev. Proc. 99-32, 1999-2 C.B. 296, permits qualifying U.S. taxpayers to make the secondary adjustments required by sec. 1.482-1(g)(3)(i), Income Tax Regs., after a sec. 482 adjustment by establishing an interest-bearing account receivable from, or payable to, a related person in the amount of the transfer pricing primary adjustment in lieu of treating the allocated amount as a deemed dividend or a capital contribution.  Rev. Proc. 99-32, secs. 1, 4.01, 1999-2 C.B. at 297, 299; see infra pp. 15-17.

II.     Petitioner's Repatriation and Section 965 Election

In 2005 petitioner's and ADBV's boards of directors approved a domestic reinvestment plan to repatriate a cash dividend to take advantage of a limited 85% DRD under section 965.  See infra pp. 13-14.  Petitioner's representatives at this time were aware of guidance that the IRS had issued in the form of three IRS notices with respect to section 965.  See infra p. 18 (describing the IRS notices).

ADBV declared the dividend and paid it to petitioner on October 24, 2005.[7] At the time of the payment of the dividend, ADBV's cash balance, including marketable securities and short-term investments, was approximately $1.6 billion. Its cash balance at the end of its 2005 taxable year, after it paid the dividend, was $485,306,732.

Petitioner attached a Form 8895, One-Time Dividends Received Deduction for Certain Cash Dividends from Controlled Foreign Corporations, to its timely filed Federal income tax return for 2005.  On the Form 8895 petitioner claimed a section 965 DRD of $879,629,844.  Form 8895 requires the taxpayer claiming a section 965 DRD to report the related party indebtedness of its CFCs as of the beginning and end of the testing period.  Generally, an increase in the related party

---

[7]After consideration of the sec. 965(b)(2) base period limitation, the total qualifying dividend that ADBV distributed to petitioner equaled $1,034,858,640.

indebtedness of its CFCs during the testing period decreases the amount of the dividends eligible for the DRD.  See sec. 965(b)(3).  Petitioner's testing period was between October 3, 2004, and October 29, 2005.[8]  Petitioner reported zero related party indebtedness for both the beginning and the end of the testing period.

III.    The IRS' Examination for Petitioner's 2004-05 Taxable Years, Petitioner's Rev. Proc. 99-32 Election, and the Notice of Deficiency

The IRS commenced an examination for petitioner's 2004 and 2005 taxable years in May 2006.  The IRS commenced an examination for petitioner's 2006-07 taxable years around May 2006 and April 2007, respectively.[9]

On May 3, 2007, the IRS faxed to petitioner an issue resolution agreement stating that ADBV's payments of the additional royalty amount resulted in a

---

[8]Pursuant to Notice 2005-38, sec. 7.01(b)(vi), 2005-1 C.B. 1100, 1111, a taxpayer may choose an alternative initial measurement date.  Nothing in the record suggests that petitioner chose one of the alternative dates.

[9]The examinations were conducted with petitioner's participation in the IRS Compliance Assurance Process (CAP) beginning for taxable year 2006.  Under the IRS CAP program, the IRS and the participating taxpayer work to achieve Federal tax compliance before the taxpayer files a return for the year.  Petitioner's 2004-05 taxable years were considered "transition years", and the examinations for 2004-05 were simultaneous with the CAP examination for 2006.  To the extent that respondent objects to these statements on relevancy grounds, the objection is overruled.

constructive dividend to petitioner.[10]  In a letter to the IRS dated July 17, 2007,

petitioner's chief financial officer requested relief under Rev. Proc. 99-32, supra,

with respect to the additional royalty amount (Rev. Proc. 99-32 election).  The

election would permit petitioner to establish interest-bearing accounts receivable

from ADBV instead of treating the transfer pricing adjustments as a constructive

dividend to petitioner.  See infra pp. 16-18.

Petitioner's treasurer, William Martin, also attached a "Statement Pursuant

to Revenue Procedure 99-32" to petitioner's timely filed 2006 tax return to ensure

that the IRS would not treat ADBV's payment of the additional royalty amount as

a dividend.  The statement reiterated petitioner's Rev. Proc. 99-32 election and

stated that petitioner was permitted to establish interest-bearing accounts

receivable from ADBV.

In October 2007, during the course of the examinations, the IRS raised

section 965(b)(3) as an issue.  On or around December 5, 2007, respondent issued

a notice of proposed adjustment (NOPA) asserting that the Rev. Proc. 99-32

election resulted in an increase in related party indebtedness of $162,166,710

---

[10]Absent a Rev. Proc. 99-32 election, the conforming adjustments required by sec. 1.482-1(g)(3)(i), Income Tax Regs., are made by treating the allocated amounts as a dividend or capital contribution as appropriate.

during petitioner's testing period, which required a reduction of the amount of the DRD that petitioner had claimed of $137,841,704.[11]

In May 2009 petitioner and the IRS signed a Form 906, Closing Agreement on Final Determination Covering Specific Matters, finalizing petitioner's Rev. Proc. 99-32 election. Petitioner's chief financial officer signed the closing agreement on petitioner's behalf. He did not have signatory authority for ADBV, and no one with signatory authority for ADBV signed the agreement.

The parties' closing agreement is titled "Closing Agreement on Final Determination Covering Specific Matters" (sometimes, Rev. Proc. 99-32 closing agreement). The first section of that agreement includes the recitals, which are introductory, explanatory clauses beginning with the word "whereas". Some recitals in the closing agreement are specifically negotiated, while others borrow standard terms from the IRS' Rev. Proc. 99-32 Pattern Agreement. See Internal Revenue Manual (IRM) pt. 8.13.1-22 (Nov. 9, 2007). One of the specifically negotiated recitals states: "The Parties desire to enter into this closing agreement to resolve with finality certain issues identified below that the IRS reviewed

---

[11]A copy of the NOPA is not in the record, but it apparently did not mention any closing agreement under Rev. Proc. 99-32, supra.

during CAP, which impact the taxpayer's tax year ended October 28, 2006".[12]  The recitals with standard terms address the primary adjustments under section 482 (i.e., the 6% royalty), petitioner's Rev. Proc. 99-32 election, and respondent's decision that the provisions of Rev. Proc. 99-32, supra, should apply.

After the recitals is a caption that states:  "NOW IT IS HEREBY DETERMINED AND AGREED, for all Federal income tax purposes that".  This is standard wording from the IRS' Rev. Proc. 99-32 Pattern Agreement.  See IRM pt. 8.13.1-22; see also Rev. Proc. 68-16, sec. 6.05(3), 1968-1 C.B. 770, 779 (stating that the caption emphasizes the transition from the recitals to matters upon which the parties have agreed).

The "determined" clauses--those to which the parties agreed to be bound--follow the caption and include both standard and specifically negotiated terms. One of the determined clauses establishes five accounts receivable between petitioner and ADBV reflecting the difference between the 2% and 6% royalty rates for 2001-05.  Each account was deemed to have been created as of the last day of petitioner's taxable year to which it relates.  The determined clause establishing the accounts receivable states:  "Taxpayer has established

_____

[12]Two other specifically negotiated recitals state that "the Parties identified certain issues for IRS review" and that "the Parties agreed to work diligently and in good faith to arrive at a resolution of all issues identified for review".

intercompany Accounts Receivable, set forth below, which were recorded on Taxpayer's books and treated as term loans to Controlled Entity [ADBV] reflecting the following balances, each such Account Receivable being deemed to have been created as of the last day of the taxable year to which it relates." These deemed accounts receivable did not come into existence until the execution of the closing agreement.

Other determined clauses discuss, inter alia, payment of the accounts receivable,[13] the tax implications of the payments,[14] and the calculation of interest on the accounts. The closing agreement does not mention section 965(b)(3), and we infer from this that the parties did not reach an agreement with respect to section 965(b)(3) in the closing agreement.

---

[13]Certain distributions that petitioner received from ADBV in 2002-04 were treated as prepayments of the accounts receivable. At the time of the execution of the closing agreement, the accounts had been fully paid. The closing agreement also states that "[p]ayment of the accounts receivable and interest thereon * * * will be free of the Federal income tax consequences of the secondary adjustments that would result from the primary adjustments * * * had Taxpayer and the Commissioner not entered into this agreement."

[14]The closing agreement states that the payments and prepayments of the accounts shall not be treated as dividends under sec. 316 or for any other Federal income tax purpose and are therefore not eligible for a foreign tax credit under secs. 901-902 or a DRD under secs. 241-247.

The IRS subsequently issued a notice of deficiency dated April 19, 2012, determining that the accounts receivable established under Rev. Proc. 99-32, supra, constituted an increase in related party indebtedness during petitioner's testing period under section 965(b)(3). The IRS therefore determined to decrease the amount of the 2005 dividend eligible for the section 965 DRD. Respondent would not have determined that section 965(b)(3) applies to the accounts receivable absent petitioner's Rev. Proc. 99-32 election and the closing agreement. Petitioner timely filed a petition in this Court for redetermination.

## Discussion

I. Applicable Law and IRS Guidance

A. Section 965

Section 965 was enacted in October 2004 by the American Jobs Creation Act of 2004, Pub. L. No. 108-357, sec. 422(a), 118 Stat. at 1514-1515. It was subsequently amended by the Gulf Opportunity Zone Act of 2005, Pub. L. No. 109-135, sec. 403(q)(3), 119 Stat. at 2627. Section 965(a) provides that a corporation that is a U.S. shareholder of a CFC may elect a one-time 85% DRD for eligible cash dividends received from the CFC.[15] Generally, a taxpayer makes a

---

[15]The DRD was available only for a limited time and is now expired. See sec. 965(f) (providing the years for which a taxpayer could have made the

(continued...)

section 965 election by filing a Form 8895 with its timely filed Federal income tax return for the year.  See Notice 2005-10, sec. 7, 2005-1 C.B. 474, 480-481.

Although section 965 imposes several limitations on the availability and the amount of the DRD, this case concerns only the limitation provided by section 965(b)(3).  Section 965(b)(3) reduces the amount of the eligible dividend by any increase in the amount of indebtedness of the CFC to any related party during the testing period (related party indebtedness).  The testing period is generally the period between October 3, 2004, and the close of the taxable year for which the taxpayer makes the election.  Sec. 965(b)(3)(A) and (B).

The Commissioner has carved out an exception to the related party indebtedness rule for intercompany trade payables.  Indebtedness arising in the ordinary course of business from sales, leases, licenses, or the rendition of services that a related person provides to or for a CFC is not related party indebtedness under section 965(b)(3), provided that the indebtedness is actually paid within 183 days.  See Notice 2005-64, sec. 10.08, 2005-2 C.B. 471, 489; Notice 2005-38, sec. 7.02(b), 2005-1 C.B. 1100, 1111.

_____

[15](...continued)
election).

B.    Secondary Adjustments Under Section 482

Section 482 authorizes the Secretary to adjust the items of entities owned or controlled by the same interests. When the Secretary[16] makes an allocation under section 482, the adjustment of the controlled taxpayer's income is known as a primary allocation. See sec. 1.482-1(g)(2)(i), Income Tax Regs. The regulations require corresponding adjustments with respect to the income of members of the group that were affected by the primary allocation. See id. These corresponding adjustments are known as correlative allocations. See id. For example, if a primary allocation increases a U.S. parent corporation's income, the correlative allocation would decrease the income of its CFC by the same amount. See id.

Because the primary and correlative allocations shift taxable income from one related party to the other, the entities must make so-called secondary or conforming adjustments to reconcile the entities' cash accounts with their adjusted tax positions. See id. subpara. (3)(i). The regulations under section 482 provide two methods of making the secondary adjustments. See id. Where, as here, a U.S. parent corporation's income has been increased and its CFC's income has been decreased as a result of a transfer pricing adjustment, the methods include:

---

[16]The term "Secretary" means the Secretary of the Treasury or his delegate. Sec. 7701(a)(11)(B); see sec. 1.482-1(a)(2), Income Tax Regs.

treating the allocated amount as a deemed dividend from the CFC to the U.S. parent; or "in appropriate cases, pursuant to such applicable revenue procedures as may be provided by the Commissioner * * * repayment of the allocated amount without further income tax consequences." Id.

The Commissioner promulgated Rev. Proc. 99-32, supra, pursuant to the above-quoted regulation.[17] Rev. Proc. 99-32, supra, permits qualifying U.S. taxpayers to make secondary adjustments by establishing an interest-bearing account receivable from, or payable to, its CFC in the amount of the primary transfer pricing adjustment in lieu of treating the adjustment as a deemed dividend or a capital contribution. Rev. Proc. 99-32, secs. 1, 4.01, 1999-2 C.B. at 297, 299.

For cases pending before the IRS, a taxpayer may elect treatment under Rev. Proc. 99-32, supra, by requesting the election in writing signed by a person with authority to sign the U.S. taxpayer's Federal income tax returns and submitting the request before "closing action is taken on the primary adjustment." Id. sec. 5.01(1), 1999-2 C.B. at 300. If the taxpayer qualifies, the IRS and the U.S.

---

[17]Rev. Proc. 99-32, supra, superseded Rev. Proc. 65-17, 1965-1 C.B. 833.

taxpayer will enter into a closing agreement under section 7121 of the Code.[18] Id. sec. 5.01(3) and (4).

Rev. Proc. 99-32, sec. 4.01, describes the features of an account established under these procedures. The account may be established and paid "without the Federal income tax consequences of the secondary adjustments that would otherwise result from the primary adjustment." The account is deemed to have been created as of the last day of the taxable year for which the primary adjustment was made. It bears interest computed pursuant to section 1.482-2(a)(2), Income Tax Regs., from the day after the deemed establishment date. For purposes of section 1.482-2(a)(2)(iii), Income Tax Regs., dealing with safe haven interest rates, the account "shall be considered to be a loan or advance having a term extending from the day after the date the account is deemed to have been created through the expiration of" 90 days after execution of the closing agreement on behalf of the Commissioner. Rev. Proc. 99-32, secs. 4.01(2), 5.01(4)(e).

Rev. Proc. 99-32, sec. 4.03, clarifies that electing treatment under that revenue procedure does not affect the primary adjustment but affects the

---

[18]For taxpayer-initiated adjustments under sec. 1.482-1(a)(3), Income Tax Regs., a U.S. taxpayer may elect Rev. Proc. 99-32, supra, treatment by filing a statement with the Federal income tax return that reports the primary adjustment. Rev. Proc. 99-32, sec 5.02, 1999-2 C.B. at 300-301. Petitioner's 2001-05 taxable years were pending before the IRS.

taxpayer's taxable income and credits to the extent indicated in Rev. Proc. 99-32, sec. 4.01.[19] Rev. Proc. 99-32, sec. 4.03, further states that the election eliminates "the collateral effects of secondary adjustments, such as those described in section 2 [regarding deemed dividend treatment]."

      C.      IRS Guidance on the Intersection of Section 965 and
                    Rev. Proc. 99-32

No statutory or regulatory authority addresses the intersection of section 965 and Rev. Proc. 99-32 closing agreements. However, in 2005 the IRS issued three notices relating to section 965. See Notice 2005-64, supra; Notice 2005-38, supra; Notice 2005-10, supra. Notice 2005-64, sec. 10.06, includes one sentence stating that "[a]ccounts payable" established under Rev. Proc. 99-32, supra, are treated as related party indebtedness for purposes of section 965(b)(3). The notice does not include any analysis of this statement.

In September 2008 the IRS Associate Chief Counsel (International) released Advice Memorandum AM 2008-010 (advice memorandum). The advice

---

[19]Rev. Proc. 99-32, sec. 4.01(4), discusses the Federal tax consequences of payment of the account. The account must be paid or treated as prepaid by offset within a 90-day period, and such payment "shall be treated as a payment of the account for all Federal income tax purposes, regardless of its characterization under foreign law." Id. For example, payment by an offset that would otherwise constitute a dividend will not qualify as a dividend for any Federal income tax purpose. See id.

memorandum stated that an account receivable established under Rev. Proc. 99-32, supra, is treated as debt for purposes of section 965(b)(3). It recommended that "all closing agreements under Rev. Proc. 99-32 covering a taxable year in which the taxpayer elected the benefit of * * * [section] 965 include language confirming that the account receivable established in the closing agreement constitutes related party indebtedness for purposes of * * * [section] 965(b)(3)." However, the advice memorandum asserted that a failure to include such wording in a closing agreement did not preclude related party indebtedness treatment of an account receivable. See id.

II.     BMC Software, Inc. v. Commissioner

We first addressed the intersection of section 965(b)(3) and Rev. Proc. 99-32 closing agreements in BMC Software, Inc. v. Commissioner (BMC Software I), 141 T.C. 224 (2013), rev'd, 780 F.3d 669 (5th Cir. 2015). BMC Software, Inc. (BMC), a U.S. corporation, had claimed a section 965 DRD for its 2006 taxable year. Id. at 226, 228. Unrelated to the DRD, BMC had paid royalties to its CFC for 2002-06 with respect to software that the entities had collaboratively developed. Id. at 226. In 2007 BMC and the Commissioner entered into a transfer pricing closing agreement for 2003-06 reflecting the Commissioner's determination that the royalty amount should be reduced to reflect

arm's-length pricing.  See id.  Also in 2007 BMC and the Commissioner entered into a closing agreement under Rev. Proc. 99-32, supra, to conform the entities' cash accounts with the primary adjustment.  See id. at 227.  The Rev. Proc. 99-32 closing agreement created two accounts receivable from the CFC to BMC "for Federal income tax purposes", which were deemed established as of the close of BMC's 2005 and 2006 taxable years.  See id.  The CFC paid the accounts receivable in full within 90 days of the closing agreement.  Id.  The Commissioner subsequently issued BMC a notice of deficiency for 2006 determining that the accounts receivable constituted a retroactive increase in related party indebtedness under section 965(b)(3) that reduced BMC's claimed section 965 DRD.  See id. at 228.

A.     Our Holding in BMC Software I

We began our analysis in BMC Software I with section 965.  After determining that section 965(b)(3) does not include an intent requirement, we referred to dictionary definitions of the word "indebtedness" and concluded that, for purposes of section 965(b)(3), indebtedness means "the condition of owing money or being indebted."  See BMC Software I, 141 T.C. at 232.  We next determined that an account receivable established under Rev. Proc. 99-32, supra, meets the definition of indebtedness because an account receivable is "defined as

'[a]n account reflecting a balance owed by the debtor.'" See id. at 232-233 (quoting Black's Law Dictionary 18 (8th ed. 2004)).

We then analyzed the effect of the parties' Rev. Proc. 99-32 closing agreement on our analysis of section 965(b)(3). See id. at 234. Relying on Schering Corp. v. Commissioner, 69 T.C. 579 (1978), we stated that Rev. Proc. 99-32, supra, does not preclude all collateral Federal income tax consequences. We held that the Rev. Proc. 99-32 closing agreement relieved the taxpayer of the consequences that would have resulted absent the election but that "the accounts receivable are deemed established for all Federal tax purposes". See BMC Software I, 141 T.C. at 237. Because the closing agreement provided that the accounts receivable were deemed to have been established during BMC's section 965(b)(3) testing period, we held that the accounts receivable qualified as a retroactive increase in related party indebtedness during the testing period. We therefore sustained the Commissioner's determination.[20] See id. at 237-238.

---

[20]We also held that the accounts receivable did not qualify for the trade payables exception under Notice 2005-38, sec. 7.02(b), and Notice 2005-64, sec. 10.08, 2005-2 C.B. 471, 489.

B.    <u>The U.S. Court of Appeals for the Fifth Circuit's Holding in BMC Software II</u>

BMC appealed our decision to the U.S. Court of Appeals for the Fifth Circuit. The Court of Appeals first considered section 965(b)(3). <u>See</u> <u>BMC Software, Inc. v. Commissioner</u> (<u>BMC Software II</u>), 780 F.3d at 674-675. The Court concluded that: (1) because section 965(b)(3) provides that the final calculation of the amount of related party indebtedness is to be made "as of the close of the taxable year for which the election * * * is in effect" and (2) because BMC's accounts receivable did not exist until the parties executed the closing agreement in 2007, the accounts receivable were not related party indebtedness under section 965(b)(3). <u>See</u> <u>id.</u> at 675. Moreover, the Court of Appeals stated that "[t]he fact that the accounts receivable * * * [were] backdated does nothing to alter the reality that they did not exist during the testing period" because the accounts were secondary adjustments to correct cash account imbalances and not a correction of a prior year's accounts. <u>See</u> <u>id.</u>

The Court of Appeals then considered whether the parties contractually agreed in the Rev. Proc. 99-32 closing agreement to treat the accounts receivable as related party indebtedness despite the plain language of section 965(b)(3). <u>See</u> <u>id.</u> at 676. Noting that the closing agreement did not mention section 965, the

Court of Appeals concluded that the standard closing agreement phrase "for Federal income tax purposes" did not expand the scope of the contract to include section 965. Otherwise, the Court of Appeals reasoned, the provisions in the closing agreement regarding foreign tax credits and the tax implications of interest payments would be surplusage. See id. Additionally, the Court of Appeals applied the canon expressio unius est exclusio alterius, which means that "the specificity and apparent comprehensiveness of an agreement's enumeration of a category of things (here, tax implications) implies that things not enumerated are excluded". Id. Because the closing agreement listed several tax implications with specificity but did not mention others, such as section 965, the Court held that the closing agreement "excluded those tax consequences which it failed to enumerate."[21] Id. at 676-677.

The Court of Appeals also distinguished Schering. The Court stated that Schering involved a collateral tax consequence that flowed from an action that the taxpayer had taken on the basis of a closing agreement, i.e., the payment of accounts receivable established under the predecessor of Rev. Proc. 99-32, supra.

_____

[21] Although the Court of Appeals did not find the closing agreement to be ambiguous, it found that the extrinsic evidence proved that the parties did not intend for the closing agreement to alter the plain meaning of sec. 965(b)(3). See BMC Software, Inc. v. Commissioner, 780 F.3d 669, 677 (5th Cir. 2015), rev'g 141 T.C. 224 (2013).

However, the issue in BMC Software, Inc. was the tax consequences of the establishment of the accounts receivable themselves, not any action that BMC had taken as a result of the closing agreement. See BMC Software II, 780 F.3d at 678. Therefore, the Court of Appeals reversed our holding in BMC Software I.

Absent a stipulation to the contrary, this case is appealable to the U.S. Court of Appeals for the First Circuit, which has not yet considered the issue. See sec. 7482(b)(1)(B), (2). BMC Software II is therefore not binding on us in the instant case. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). However, given the reversal and the parties' arguments, the instant case requires us to revisit our analysis in BMC Software I.

III.   Stare Decisis

The doctrine of stare decisis is important to this Court, and we are mindful of its role in this case. In Vasquez v. Hillery, 474 U.S. 254, 265-266 (1986), the Supreme Court stated:

> [T]he important doctrine of stare decisis * * * [is] the means by which
> we ensure that the law will not merely change erratically, but will
> develop in a principled and intelligible fashion. * * * While stare
> decisis is not an inexorable command, the careful observer will
> discern that any detours from the straight path of stare decisis in our
> past have occurred for articulable reasons, and only when the Court
> has felt obliged "to bring its opinions into agreement with experience
> and with facts newly ascertained." Burnet v. Coronado Oil & Gas
> Co., 285 U.S. 393, 412 (1932) (Brandeis, J., dissenting).

Our history does not impose any rigid formula to constrain the Court in the disposition of cases. Rather, its lesson is that every successful proponent of overruling precedent has borne the heavy burden of persuading the Court that changes in society or in the law dictate that the values served by stare decisis yield in favor of a greater objective. * * *

This case presents issues on which a Court of Appeals has reversed our prior decision. In such a scenario, "[c]learly * * * [we] must throughly reconsider the problem in the light of the reasoning of the reversing appellate court and, if convinced thereby, the obvious procedure is to follow the higher court."[22] Bayer v. Commissioner, 98 T.C. 19, 22 (1992) (quoting Lawrence v. Commissioner, 27 T.C. 713, 716-717 (1957), rev'd on other grounds, 258 F.2d 562 (9th Cir. 1958)); see also Trout v. Commissioner, 131 T.C. 239, 245 n.6 (2008) ("But nothing in Golsen or in Lawrence precludes us from revisiting an issue, as we do here, when the issue on which there has been an intervening reversal arises anew."). By revisiting the issues in BMC Software I, we are not capriciously disregarding our prior analysis but rather examining the issues in the light of a Court of Appeals' opinion, which deserves careful attention and reflection.

---

[22]We apply this reasoning only when the current case is not appealable to the reversing court. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

Moreover, the principles in BMC Software I are not entrenched precedent. The issues in this case have come before us only once before, and no other opinions rely on or cite our previous holding. See Estate of Bradley v. Commissioner, 1 T.C. 518, 527 (1943) (holding that stare decisis was not an impediment to overruling a prior opinion when only two other cases relied on it), aff'd, 140 F.2d 87 (2d Cir. 1944); cf. Hesselink v. Commissioner, 97 T.C. 94, 99 (1991) (stating that the application of stare decisis was "particularly apropos" because there were "numerous and consistent court opinions interpreting and/or applying" the previous holding). To our knowledge, no other Court of Appeals has spoken on the issues we consider today. Therefore, the important goals of stare decisis to ensure the "evenhanded, predictable, and consistent development of legal principles" and to "foster[] reliance on judicial decisions", see Payne v. Tennessee, 501 U.S. 808, 827 (1991), are not served by our continued adherence to our previous Opinion. There has been no predictable or consistent development of the legal principles affecting this case. See Jefferson v. Commissioner, 50 T.C. 963, 967 (1968) (stating that stare decisis, "which arose from a necessity to preserve the harmony and stability of the law, requires adherence by courts to a principle of law [original emphasis] settled by a series of decisions" (last emphasis added)); cf. Stewart v. Commissioner, 127 T.C. 109, 114-116 (2006) (overturning

a prior Tax Court opinion when a Court of Appeals had reversed our earlier opinion and we had examined the issue only once before); Lunsford v. Commissioner, 117 T.C. 159, 164 (2001) (overruling a case that the Court had decided in the early stages of its section 6320/6330 jurisprudence).

Generally, stare decisis is of particular importance in cases involving contract rights, because reliance interests are involved, Payne, 501 U.S. at 828, and cases involving statutory construction, because of the possibility of legislative intervention, John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 131 (2008). Although contract rights are at issue here, we find it unlikely that the Commissioner would have relied to his detriment on our Opinion in BMC Software I by deciding to leave a section 965 provision out of future Rev. Proc. 99-32 closing agreements, especially given the advice memorandum and BMC's appeal. We also find the possibility of congressional action on this issue to be low because the section 965 election has expired.

On balance, we conclude that the importance of reaching the right result in this case outweighs the importance of following our precedent. But cf. Burnet v. Coronado Oil & Gas Co., 285 U.S. at 406 (Brandeis, J., dissenting) ("[I]n most matters it is more important that the applicable rule of law be settled than that it be

settled right."). We therefore conclude that stare decisis does not prevent us from reconsidering BMC Software I, and we do so below.

IV.    Petitioner's Rev. Proc. 99-32 Closing Agreement

We first examine petitioner's Rev. Proc. 99-32 closing agreement to determine whether the parties contractually agreed to treat the accounts receivable as related party indebtedness for purposes of the DRD.[23]

A.    Closing Agreements Generally

The Secretary is authorized to enter into closing agreements with taxpayers pursuant to section 7121(a). Although certain closing agreements settle the taxpayer's total tax liability for a particular period, a Form 906 closing agreement, which is the type at issue here, is used to settle specific matters affecting tax liability. See Manko v. Commissioner, 126 T.C. 195, 202 (2006); Estate of Magarian v. Commissioner, 97 T.C. 1, 5 (1991).

A closing agreement is "final and conclusive", and it is binding on the parties "as to the matters agreed upon". See sec. 7121(b); Estate of Magarian v. Commissioner, 97 T.C. at 4-6. "Under section 7121 a court may not include as part of the agreement matters other than the matters specifically agreed upon and

---

[23]We limit our analysis to whether the parties agreed to treat the accounts receivable as related party indebtedness for purposes of the DRD. We do not opine on whether the accounts receivable constituted debt for any other purpose.

mentioned in the closing agreement." Zaentz v. Commissioner, 90 T.C. 753, 766 (1988). The scope of a closing agreement is therefore strictly construed to encompass only the issues enumerated in the closing agreement itself. Any recitals in a closing agreement are not binding on the parties. See id. at 762. However, recitals are explanatory and can give insight into the intent of the parties. See Estate of Magarian v. Commissioner, 97 T.C. at 5; see also Rev. Proc. 68-16, sec. 6.05(3) ("It is important to distinguish between matters which are merely informative and explanatory and matters which are being agreed upon. The former should be segregated from the latter and should ordinarily be reflected in the introductory recitals contained in the WHEREAS clauses".).

Closing agreements are contracts, and they are subject to the rules of Federal common law contract interpretation. See Long v. Commissioner, 93 T.C. 5, 10 (1989) (citing United States v. Lane, 303 F.2d 1, 4 (5th Cir. 1962)), aff'd without published opinion, 916 F.2d 721 (11th Cir. 1990). Contracts are construed according to the intent of the parties as of the time of entering into the agreement. Id. Intent is inferred from the four corners of the agreement where the contract is unambiguous; extrinsic evidence may be used to discern intent where the contract has ambiguities. Rink v. Commissioner, 100 T.C. 319, 325 (1993), aff'd, 47 F.3d 168 (6th Cir. 1995). The starting point for ascertaining the parties'

intent is the contract itself.  See Nault v. United States, 517 F.3d 2, 4 (1st Cir. 2008) (quoting Filiatrault v. Comverse Tech., Inc., 275 F.3d 131, 135 (1st Cir. 2001)).  The contract must be read as a whole, and the contract must be interpreted in context.  See Kolbe v. BAC Home Loans Servicing LP, 738 F.3d 432, 439-440 (1st Cir. 2013) (and cases cited threat).  This is because "[t]he meaning of words * * * commonly depends on their context[.] * * * When the parties have adopted a writing as a final expression of their agreement, interpretation is directed to the meaning of that writing in the light of the circumstances."  2 Restatement, Contracts 2d, sec. 202, cmt. b (1981).

B.      Analysis of Petitioner's Rev. Proc. 99-32 Closing Agreement

1.      The Four Corners of the Agreement

In BMC Software I, we held that a closing agreement that established similar accounts receivable "for Federal income tax purposes" created related party indebtedness under section 965(b)(3).[24]  We acknowledge that, in this case, the closing agreement states that the accounts receivable were established (and that petitioner treated them as "term loans") "for all Federal income tax purposes".

---

[24]Like the Commissioner in BMC Software I, respondent does not contend that petitioner intended to directly or indirectly finance the sec. 965 dividend by electing Rev. Proc. 99-32 treatment or entering into the Rev. Proc. 99-32 closing agreement.

However, in BMC Software I we did not consider the context in which the parties used the caption, which the rules of Federal common law contract interpretation require us to do. We therefore interpret the closing agreement by giving proper weight to the section 7121 jurisprudence and the closing agreement as a whole.

The parties entered into the closing agreement against the backdrop of longstanding caselaw holding that "a court may not include as part of the agreement matters other than the matters specifically agreed upon and mentioned in the closing agreement." See Zaentz v. Commissioner, 90 T.C. at 766. Comments in the IRM accompanying the IRS' Pattern Agreement, from which much of the closing agreement's wording is derived, recognize and incorporate this principle. IRM pt. 8.13.1-22(E) para. (1) states: "Matters expressly determined in closing agreements are accorded finality under section 7121 of the Code. Though certain inferences and substantially automatic consequences may appear to logically flow from such determinations, these results cannot be considered to be matters determined with finality unless expressly provided for in the closing agreement."[25] Additionally, the closing agreement is self-limiting.

_____

[25]The Internal Revenue Manual (IRM) pt. 8.13.1-22(E) (Nov. 9, 2007) gives this explanation for why the IRS' Pattern Agreement includes an appended table that reports the effect on earnings and profits directly resulting from the sec. 482 allocations.

One of the separately negotiated recitals, while not binding on the parties, expressly conveys the parties' intent to limit the scope of the closing agreement to "certain issues identified below".[26] Therefore, both the recitals in the closing agreement itself and the relevant jurisprudence restrict the closing agreement to matters specifically enumerated.

A caption taken verbatim from the IRS' Pattern Agreement is not a matter to which the parties specifically agreed. It is not a determined clause that binds the parties, but rather an introductory phrase that signals the transition from the recitals to the determined clauses.[27] See Rev. Proc. 68-16, sec. 6.05(3). Therefore, our giving the phrase "for all Federal income tax purposes" a literal application would be to ignore our mandate to interpret a contract in context and would

_____

[26]We note that the closing agreement in BMC Software, Inc. did not include such a recital. However, we are not convinced that this distinction alone, or the parties' contentions regarding differences between the two closing agreements, distinguish the closing agreements in this context.

[27]Rev. Proc. 68-16, sec. 6.05(3), 1968-1 C.B. 770, 779, states that "[e]ach such clause should ordinarily be drafted with the view that it is a continuation of the" caption. However, it also states that the matters being determined and agreed upon are preceded by the caption and that the caption emphasizes the transition from the recitals. This implies that the caption is not part of the matters to which the parties agreed but rather suggests that the caption informs the syntax of the determined clauses and not the substance. We do not take Rev. Proc. 68-16, supra, to support the view that the caption transforms a narrow closing agreement to a broad, sweeping one.

broaden the scope of the closing agreement beyond what the parties intended.[28]

See 17A C.J.S., Contracts, sec. 399 (2011); cf. 11 Williston on Contracts, sec. 32:10 (4th ed. 1999) ("Even absent a true conflict, specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate."); see also New Seabury Co. Ltd, P'ship v. New Seabury Props., LLC (In re New Seabury Co. Ltd. P'ship), 450 F.3d 24, 35 (1st Cir. 2006) ("Courts will not read language into a contract where it does not appear."); Estate of Magarian v. Commissioner, 97 T.C. at 5-6 (holding that the taxpayer and the

---

[28]To the extent that the recital limiting the closing agreement to "certain issues identified below" and the caption "for all Federal income tax purposes" are inconsistent, we give greater weight to the recital. Both of the clauses are introductory, coming before the "determined" clauses of the closing agreement. However, the recital is a separately negotiated contract term while the phrase "for all Federal income tax purposes" is part of the standard wording of the IRS' Pattern Agreement. See 2 Restatement, Contracts 2d, sec. 203(d) (1981) ("[S]eparately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated."). But cf. Silva v. Encyclopedia Britannica, Inc., 239 F.3d 385, 389 (1st Cir. 2001) (stating that boilerplate contract provisions are not ipso facto invalid). Additionally, the recital is a specific clause that defines the scope of the contract. The phrase "for all Federal income tax purposes" is general wording. Specific terms are more likely to express the intent of the parties than general terms and are given greater weight. See 2 Restatement Contracts 2d, sec. 203(c) and cmt. (e); 11 Williston on Contracts, secs. 32:10, 32:15 (4th ed. 1999).

Commissioner did not agree to additions to tax when the closing agreement did not specifically mention them).

The determined clauses--in which the parties specifically stated to what they agreed--established the accounts receivable as described in Rev. Proc. 99-32, sec. 4.01; provided for the rates and amounts of interest; and described the methods by which ADBV paid the accounts, including the tax implications of the payments. Certain matters with respect to the accounts, such as the tax consequences of ADBV's payment of the account, were specifically enumerated. Any tax implication of the establishment of the accounts themselves was not, and the closing agreement does not mention section 965. See BMC Software II, 780 F.3d at 676-677 (finding that the closing agreement in that case did not extend to section 965 because that agreement enumerated other specific tax consequences).

Because the parties enumerated in considerable detail the tax consequences of the closing agreement, we find that these specific clauses must be interpreted to limit the phrase "for all Federal income tax purposes". We therefore hold that when the parties signed the closing agreement they did not manifest an intent with respect to section 965(b)(3). Instead we find that the parties' intent was to reconcile the cash accounts of petitioner and ADBV with their adjusted tax

positions as a result of the section 482 primary adjustment.  This was completely
unrelated to the section 965 DRD.

The dissent would have us give the phrase "for all Federal income tax
purposes" a literal interpretation and ignore the intent of the parties.  The parties
signed a closing agreement that enumerated specific tax consequences, and section
965 was not specifically enumerated.[29]  Although this phrase is conspicuously
presented and both parties could read it, a literal interpretation of the boilerplate
phrase "for all Federal income tax purposes" would render surplusage the
provisions of the closing agreement that "lists the transaction's tax implications in
considerable detail."  See BMC Software II, 780 F.3d at 676 ("If the parties

---

[29]The dissent contends that specifically enumerating all tax consequences
was unnecessary because the closing agreement is "for all Federal income tax
purposes".  In addition to not referencing sec. 965, the dissent notes that the
closing agreement did not reference sec. 11 (tax imposed) and sec. 6601 (interest
on underpayment).  See dissenting op. pp. 50-51.  However, those provisions are
still applicable to the closing agreement, but specific references were not
necessary.  The closing agreement created the accounts receivable under Rev.
Proc. 99-32, supra, which states that the interest by the obligee is taxable income.
Therefore a reference to sec. 11 would be redundant.  Additionally, sec. 301.7121-
1(d)(2), Proced. & Admin. Regs. provides that "[a]ny tax or deficiency in tax
determined pursuant to a closing agreement shall be assessed and collected * * *
in accordance with the applicable provisions of law."  IRM pt. 8.13.1.2.18 (Nov.
9, 2007), and Rev. Proc. 68-16, sec. 6.16, 1968-1 C.B. at 786, state that a closing
agreement should not determine interest liability unless there is an issue with
respect to interest liability, but that the interest will be assessed and collected.  In
this case there is no issue with the underpayment interest.

agreed, in the boilerplate provision, to treat the accounts receivable as retroactive indebtedness for all Federal tax purposes, then these additional provisions would be surplusage." (Alteration in original)). We focus our analysis on specific tax implications enumerated in the closing agreement as evidence of the parties' intent rather than a general provision that is intended as a transition from the recitals to the determined clauses.

We also read the holding in Schering Corp. v. Commissioner, 69 T.C. 579, to be consistent with our holding. In Schering a U.S. corporation entered into a Rev. Proc. 65-17 closing agreement that established accounts receivable to effect secondary adjustments between the corporation and its Swiss CFC. The taxing authority in Switzerland considered the CFC's payment of the account receivable to be a taxable dividend, and the CFC paid the tax as a withholding agent for the U.S. corporation.

Although the U.S. taxpayer's closing agreement stated that the repatriation would be free of Federal income tax consequences, we allowed the taxpayer a section 901 foreign tax credit with respect to the entire Swiss dividend tax. In so doing, we looked to the closing agreement as a whole and held that the phrase "free of further Federal income tax consequences" showed only the parties' intent that the taxpayer would not have gross income upon receipt of the CFC's payment

of the account "and that it was not intended to determine any collateral tax consequences disadvantageous to petitioner which might ensue upon the payment of that sum." Id. at 595. In other words, we read the disputed phrase in context rather than applying a literal interpretation that would expand the closing agreement past its intended scope. This is also the approach we take with petitioner's closing agreement.

In BMC Software I, 141 T.C. at 236, we interpreted Schering to hold that "[t]he closing agreement did not preclude all tax consequences" and therefore used it as support for our holding that BMC's closing agreement established accounts receivable "for all Federal income tax purposes", including under sec. 965(b)(3). Schering, however, requires a more nuanced reading. The Court in Schering looked to the structure and context of the closing agreement as a whole to determine what the parties intended the scope of the contract to be, which is what we do today.

We also held in Schering that Rev. Proc. 65-17, 1965-1 C.B. 833, which we "construed to mean only that the United States parent is not required to recognize gross income under section 301 upon receipt of payment of the account receivable", did not preclude the taxpayer's ability to take a foreign tax credit. Id. at 597-598. Similarly, we do not read Rev. Proc. 99-32, supra, to engender a

particular result under section 965.  Rev. Proc. 99-32, sec. 4.01, states that it

allows a U.S. taxpayer to establish and pay an account receivable to repatriate the

cash attributable to a primary adjustment "without the Federal income tax

consequences of the secondary adjustments that would otherwise result from the

primary adjustment."  This phrase refers only to the revenue procedure's purpose

of allowing a taxpayer to avoid deemed dividend treatment.  Although the revenue

procedure treats payment of the account receivable "as a payment of the account

for all Federal income tax purposes", see id. sec. 4.01(4), it does not address any

tax implications of establishing an account.

### 2.    Extrinsic Evidence of the Parties' Intent

Assuming arguendo that the parties' Rev. Proc. 99-32 closing agreement is

ambiguous, we examine extrinsic evidence of the parties' intent and apply

principles of contract interpretation to that evidence.  See Elrod v. Commissioner,

87 T.C. 1046, 1066 (1986) (explaining that we consider extrinsic evidence to

interpret contract terms or to explain the purpose and intention of contracting

parties when the contract is ambiguous).  Under the rules of Federal common law

contract interpretation, when contracting parties have attached different meanings

to a contract or a contract term, the ambiguous term "is interpreted in accordance

with the meaning attached by one of them if at the time the agreement was made

 * * * that party did not know [or had no reason to know] of any different meaning attached by the other, and the other knew [or had reason to know] the meaning attached by the first party".  2 Restatement, Contracts 2d, sec. 201(2); see Rink v. Commissioner, 100 T.C. at 326-327.  Respondent contends that, if the closing agreement is ambiguous, petitioner had reason to know of respondent's intent to treat the accounts receivable as related party indebtedness because he stated that position (1) in Notice 2005-64, sec. 10.06 and (2) to petitioner orally and in the NOPA in 2007.  Respondent therefore asserts that petitioner should be bound to respondent's understanding of the closing agreement.

Assuming arguendo that petitioner knew or had reason to know of respondent's position--despite the advice memorandum's recommendation that all closing agreements under Rev. Proc. 99-32, supra, include a provision addressing section 965(b)(3),[30] and despite the fact that the NOPA was issued two years before the closing agreement and apparently did not mention what respondent's position would be if the parties entered into a closing agreement--we disagree with respondent that petitioner should be bound to respondent's interpretation of the closing agreement.  By definition NOPAs are not final determinations but rather

---

[30]The advice memorandum was issued after the execution of BMC's closing agreement but before the execution of petitioner's.

explain proposed changes to a taxpayer's return. See IRM pt. 4.46.3.3.3.4(1)(d) (Dec. 29, 2009). Under the IRM, "unless the taxpayer's agreement to an issue is fully documented by the signing of Form 870, the issue will be treated as unagreed". Id. Petitioner did not agree to the adjustments, which put respondent on notice that petitioner did not agree with his position regarding section 965.

Under Federal common law, one party is bound to the other party's understanding of an ambiguous term only if the other party did not know or have reason to know of the first party's understanding of that term. Even assuming that petitioner knew of respondent's interpretation of the closing agreement, respondent had reason to know of petitioner's understanding as well. Both parties were aware before the execution of the closing agreement that section 965(b)(3) was an issue, yet the closing agreement did not include any provision addressing it. The extrinsic evidence shows that the parties did not reach an agreement with respect to section 965(b)(3), and we will not read a term into the closing agreement to which the parties did not agree.

V.    Applicable Federal Law

Closing agreements do not preclude the imposition of otherwise applicable law unless the parties explicitly agree on that point. Bush v. United States, 84 Fed. Cl. 90, 95 (2008) (citing Estate of Magarian v. Commissioner, 97 T.C. at 6-

7)).  The Rev. Proc. 99-32 closing agreement does not provide for a particular result under section 965(b)(3).  We therefore consider whether section 965 itself requires that the parties treat the accounts receivable as retroactive related party indebtedness that reduces the amount of petitioner's claimed DRD.

Section 965(b)(3) is titled "Reduction of benefit if increase in related party indebtedness" and provides, inter alia:

> The amount of dividends which would (but for this paragraph) be taken into account under subsection (a) shall be reduced by the excess (if any) of--
>
> (A) the amount of indebtedness of the controlled foreign corporation to any related person (as defined in section 954(d)(3)) as of the close of the taxable year for which the election under this section is in effect, over
>
> (B) the amount of indebtedness of the controlled foreign corporation to any related person (as so defined) as of the close of October 3, 2004.

In BMC Software I, 141 T.C. at 232-233, we determined that a Rev. Proc. 99-32 account receivable was "indebtedness" under section 965(b)(3) by reference to Black's Law Dictionary, which defines indebtedness as "the condition of owing money or being indebted" and an account receivable as an "account reflecting a balance owed by a debtor".  Because we held that the closing agreement for all Federal income tax purposes created accounts receivable that were deemed

established within BMC's testing period, we held that the establishment of the accounts constituted an increase in related party indebtedness under section 965(b)(3). See id. at 238.

The U.S. Court of Appeals for the Fifth Circuit, holding that the closing agreement did not alter the application of section 965, focused on the timing requirement in subsection (b)(3). It stated that "[t]he text of * * * [section] 965(b)(3) specifically requires that the determination of the final amount of indebtedness be made 'as of the close of the taxable year for which the [section 965] election * * * is in effect.'" BMC Software II, 780 F.3d at 674-675. BMC's election year was 2006. "[A]s of" 2006 the accounts receivable did not exist and indeed could not have existed until the signing of the closing agreement in 2007, which was after the testing period had closed. Id. at 675. Even though the closing agreement deemed the accounts established in 2006, it did not change the reality that the accounts did not actually exist in that year. Therefore, the Court held that the accounts did not constitute an increase in related party indebtedness during BMC's testing period. Id. at 676.

Upon consideration, we agree with the Court of Appeals' analysis that, under the plain meaning of section 965(b)(3), a CFC has an increase in related party indebtedness only if the indebtedness existed "as of" the close of the election

year. Petitioner's testing period closed long before the execution of its Rev. Proc. 99-32 closing agreement, and the accounts receivable did not exist before the closing agreement. Respondent concedes that ADBV would not have an increase in related party indebtedness if petitioner did not make an election under Rev. Proc. 99-32, supra, and did not execute the closing agreement. Therefore, the only way in which the accounts receivable could have been established "as of" the close of petitioner's election year is if the closing agreement's deemed established dates applied to the application of section 965(b)(3). We held supra that the parties did not reach an agreement in their Rev. Proc. 99-32 closing agreement with respect to section 965(b)(3), and we do not take the deemed establishment dates of the accounts to alter subsection (b)(3).

We also find, as the Court of Appeals did, that Notice 2005-64, sec. 10.06, in which the IRS states that "accounts payable" are treated as debt under section 965(b)(3), is wholly unpersuasive because it lacks any analysis and runs counter to the plain meaning of subsection (b)(3). See BMC Software II, 780 F.3d at 676. It also conflicts with Notice 2005-38, sec. 7.05(b), 2005-1 C.B. at 1112, which

comports with the statute, stating: "A U.S. shareholder determines the amount of the related party indebtedness of its CFC on the last measurement date".[31]

Accordingly, we hold under section 965(b)(3) the accounts receivable did not constitute an increase in related party indebtedness of ADBV during the testing period.

VI.    Conclusion

We hold that the accounts receivable did not constitute indebtedness under section 965(b)(3). Petitioner is therefore entitled to the entire amount of its claimed DRD under subsection (a).[32] BMC Software I is overruled.

---

[31]Moreover, a representative from ADBV did not sign the Rev. Proc. 99-32 closing agreement, and ADBV was not a party to that agreement. Parties are not contractually bound until they mutually assent to bind themselves to an agreement. Salem Laundry Co. v. New England Teamsters & Trucking Indus. Pension Fund, 829 F.2d 278, 280 (1st Cir. 1987) (citing 1 Williston on Contracts, sec. 18, at 32 (3d ed. 1954)). Sec. 965(b)(3) addresses only related party "indebtedness of the controlled foreign corporation." (Emphasis added.) Because the Rev. Proc. 99-32 closing agreement established the accounts receivable and ADBV was not a party to that agreement, the accounts cannot be indebtedness "of the controlled foreign corporation", ADBV. Cf. Ellinger v. United States, 470 F.3d 1325, 1337-1338 (11th Cir. 2006) (holding that a closing agreement between one corporation and the IRS stating that certain transfers were bona fide debts did not affect the characterization of the transfers with respect to other, related corporations).

[32]We do not reach the parties' arguments with respect to the trade payables exception.

We have considered the parties' remaining arguments, and to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered for petitioner</u>.

Reviewed by the Court.

FOLEY, VASQUEZ, GALE, THORNTON, HOLMES, PARIS, KERRIGAN, BUCH, LAUBER, NEGA, PUGH, and ASHFORD, <u>JJ</u>., agree with this opinion of the Court.

LAUBER, J., concurring: I join the opinion of the Court without reservation and write briefly in response to the dissent. The dissent is based on the presence of the word "all" in the introduction to the Analog Devices closing agreement, a word that does not appear in the introduction to the BMC Software closing agreement. Although I am a strong advocate of paying close attention to texts, I think the dissent points to a distinction without a difference.

First, as emphasized by the Court of Appeals for the Fifth Circuit in BMC Software v. Commissioner, 780 F.3d 669, 676 (5th Cir. 2015), rev'g 141 T.C. 224 (2013), and by the Court here, see op. Ct. p. 11, the introductory reference to "Federal income tax purposes" is part of the boilerplate that appears in all closing agreements. It simply recites that the parties are entering into the closing agreement to resolve a Federal tax dispute (as opposed to a corporate or an antitrust dispute) and that the agreements within the body of the document are made for Federal income tax purposes. This is truly boilerplate, in part because the point it makes is obvious. This introduction does not itself constitute an agreement but simply tells us the purpose for which the parties are entering into the specific, itemized agreements that follow. The precise form this boilerplate takes should not be outcome determinative, as the dissent would make it.

Second, I do not believe that the presence or absence of the word "all" changes the meaning. Suppose Taxpayer X reaches an agreement with the Internal Revenue Service that, "for purposes of computing X's Federal income tax liability for 2015, her itemized deductions shall be $20,000." Would the meaning change if the agreement read "for all purposes of computing X's Federal income tax liability for 2015"? I do not think so. When we say "for purposes" without any conditions, we mean "for all purposes." In short, I see no meaningful distinction between these two forms of boilerplate.

It would be different, I think, if the parties had agreed, in the body of the closing agreement, that the accounts receivable in question "shall be regarded as bona fide indebtedness for all Federal income tax purposes." But they did not agree to that. They agreed only that accounts receivable would be established and would be "deemed to have been created as of the last day of the taxable year to which * * * [they relate]."

Under Rev. Proc. 99-32, 1999-2 C.B. 296, this treatment is elective with the taxpayer. The parties entered into the closing agreement in order to square the accounts between the U.S. parent and the foreign affiliate and get the cash in the right place without payment of a taxable dividend. It makes little sense to treat the

deemed retroactive creation of accounts receivable, to which the parties agreed for a very limited purpose in 2009, as actual debt that existed in 2005.

In an effort to justify giving the word "all" outcome-determinative force, the dissent quotes a portion of a sentence from the Court of Appeals' BMC Software opinion. The dissent implies that the Court of Appeals noted the absence of the word "all" from the closing agreement and suggested that it might have decided the case differently if the word "all" had been included. See dissenting op. p. 51. That is not at all what the Court of Appeals said or implied, and this selective quotation is taken out of context.

The Court of Appeals rejected the Commissioner's submission that the parties had agreed to backdate the accounts receivable for all Federal tax purposes, concluding instead that the parties had agreed to backdate the accounts receivable only for "those tax consequences that * * * [the closing agreement] expressly enumerates." BMC Software, Inc., 780 F.3d at 677. The Court of Appeals based this conclusion on two canons of construction: expressio unius est exclusio alterius and the antisurplusage canon.

The sentence from which the dissent's squib is excerpted was part of this analysis and reads in full as follows: "If the parties agreed, in the boilerplate

provision, to treat the accounts receivable as retroactive indebtedness for <u>all</u> federal tax purposes, then these additional provisions would be surplusage." <u>Id.</u> at 676. The Court of Appeals in this sentence was not saying that it might have reached a different outcome if the boilerplate phrase had included the word "all." It was saying that the boilerplate phrase (however drafted) could not have the all-encompassing meaning the Commissioner had ascribed to it because that would render surplusage the provisions of the closing agreement that "list[] the transaction's tax implications in considerable detail." <u>Ibid.</u> The same logic applies to the closing agreement before us today, and I thus concur fully in the opinion of the Court.

MARVEL, GALE, HOLMES, BUCH, NEGA, and ASHFORD, <u>JJ</u>., agree with this concurring opinion.

GUSTAFSON, <u>J</u>., dissenting:  The taxpayer executed an agreement with the Internal Revenue Service that provides (with boldface added here):

> NOW IT IS HEREBY DETERMINED AND **AGREED, for all Federal income tax purposes that**: * * *
>
> 3)     <u>Accounts Receivable Established by Taxpayer</u>.
>
>     a)     Taxpayer has established intercompany Accounts Receivable, set forth below, which were recorded on Taxpayer's books and treated as term loans to Controlled Entity reflecting the following balances, **each such Account Receivable being deemed to have been created as of the last day of the taxable year to which it relates**.

Today the Tax Court effectively edits this provision to delete "all" and to provide instead that the agreement is only for <u>some</u> Federal income tax purposes, excluding the dividends received deduction of section 965.  I would not do so.

The agreement is on Form 906, "Closing Agreement on Final Determination Covering Specific Matters".  The "specific matters" it addresses are the royalties deemed paid to the taxpayer by its subsidiary, the resulting increase in the taxpayer's income, and the resulting accounts receivable and payable on the books of the taxpayer and the subsidiary.  The agreement does not specifically mention section 965 or the dividends received deduction.  Likewise, it does not mention section 6601 or the underpayment interest yielded by the agreement, nor even

section 11 or the income tax liability yielded by the agreement. Such specific mentions were not necessary. The agreement is "for all Federal income tax purposes" (emphasis added), and that would include sections 11, 6601, and 965.

We reconsider section 965(f)(3) because of the reversal by the U.S. Court of Appeals for the Fifth Circuit of our decision in BMC Software, Inc. v. Commissioner, 141 T.C. 224 (2013), rev'd, 780 F.3d 669 (5th Cir. 2015). However, the closing agreement at issue in BMC Software lacked the word "all" (providing instead that it was "AGREED for federal income tax purposes"); and BMC Software was therefore expressly not an instance in which "the parties agreed, in the boilerplate provision, to treat the accounts receivable as retroactive indebtedness for all federal tax purposes". 780 F.3d at 676 (emphasis in original). We do not know how that court might decide this issue where, as here, the parties did agree as to "all Federal income tax purposes". (Emphasis added.)

In BMC Software, the Court of Appeals invoked the anti-surplusage canon, and the majority attempts to do the same here, see op. Ct. p. 23, but for materially different language. That canon tells us to prefer an interpretation that gives meaning to all the contractual provisions and renders none surplus. The canon is not properly consulted to save one contractual provision from redundancy by giving no effect to another contractual provision, but that is what the Tax Court

does today:  It gives no meaning whatsoever to "all" but decides instead that "all" is simply to be ignored; and it violates the canon by rendering that word itself to be surplusage.  As to the expressio unius est exclusio alterius canon invoked in BMC Software by the Court of Appeals and in the concurring opinion, "The doctrine properly applies only when the unius (* * * the thing specified) can reasonably be thought to be an expression of all that shares in the grant * * * involved."  A. Scalia & B. Garner, Reading Law:  The Interpretation of Legal Texts 107 (2012).  Particular consequences enumerated in a closing agreement cannot reasonably be thought to implicitly exclude other consequences where the opening words of the agreement explicitly provide for "all" consequences.

The majority asserts, see op. Ct. p. 32, that this phrase "is not a matter to which the parties specifically agreed."  The word "specifically" saves this statement from being an outright error, since evidently the parties did not bargain over the wording of this phrase.  However, the parties did agree to this wording when they signed the agreement.  This wording was not foisted on an unrepresented or unsuspecting taxpayer,[1] or rendered in fine print, or hidden in a

---

[1]Rather, as respondent correctly notes, "The material terms of the contract were first detailed in a letter, written by petitioner six days after respondent confirmed that petitioner was eligible for Revenue Procedure 99-32 treatment. Ex. 43-J.  In that letter, petitioner wrote regarding the accounts receivable that

(continued...)

footnote, or even inserted in the midst of other terms of the agreement. It is conspicuously presented as the first words that follow "AGREED". The concurring opinion states, "This introduction does not itself constitute an agreement but simply tells us the purpose for which the parties are entering into the specific, itemized agreements that follow." See Lauber op. p. 46. On the contrary, the term "IT IS HEREBY DETERMINED AND AGREED, for all Federal income tax purposes that" is not a mere introduction or preface to the agreement but rather is the operative language that makes the document an agreement.

The majority, see op. Ct. pp. 32-33, 37, explicitly decides not to "giv[e] the phrase 'for all Federal income tax purposes' a literal application", but I would do so.

COLVIN, GOEKE, and MORRISON, JJ., agree with this dissent.

---

[1](...continued)
'payment within the 90-day period and any prepayment will be treated as a payment of the intercompany account for all Federal income tax purposes.' (emphasis added)."