141 T.C. No. 5

UNITED STATES TAX COURT

BMC SOFTWARE INC. Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15675-11.                    Filed September 18, 2013.

        R determined that royalty payments from P to its controlled
foreign corporation (CFC) were not arm's length under I.R.C. sec.
482. P and R then entered into a closing agreement under I.R.C. sec.
7121 making primary adjustments regarding the royalty payments.
The primary adjustments increased P's income and required P to
conform its accounts with secondary adjustments. P accomplished
the secondary adjustments by electing to establish accounts receivable
under Rev. Proc. 99-32, 1999-2 C.B. 296, rather than treat the
secondary adjustments as deemed capital contributions.

        P had previously repatriated funds from its CFC in transactions
unrelated to the royalty payments or adjustments. P claimed a
corresponding one-time dividends received deduction under I.R.C.
sec. 965. The deduction was subject to certain limitations, including
a reduction for an increased related party indebtedness between P and
its CFC. P claimed the deduction before agreeing to the primary
adjustments or establishing the accounts receivable.

R determined that the accounts receivable that were deemed established during the testing period constituted an increase in related party indebtedness and disallowed a corresponding amount of the deduction. R issued a deficiency notice. P filed a petition for redetermination.

P contends that the reduction for related party indebtedness applies only to transactions intended to finance dividends. P also asserts that the parties agreed in a closing agreement that P avoids any Federal income tax consequences from establishing the accounts receivable. P also contends that the accounts receivable do not constitute related party indebtedness.

Held: The related party debt rule under I.R.C. sec. 965(b)(3) does not apply only to increased indebtedness resulting from intentionally abusive transactions.

Held, further, the election under Rev. Proc. 99-32, supra, allows P to avoid the Federal income tax consequences of a deemed capital contribution. The repayment is treated as a return of principal and interest for all Federal income tax purposes.

Held, further, the accounts receivable are deemed established during the testing period and qualify as increased related party indebtedness.

George Matthew Gerachis, Christine L. Vaughn, and Lina G. Dimachkieh, for petitioner.

Daniel L. Timmons, for respondent.

KROUPA, <u>Judge</u>: Respondent determined a $13 million[1] deficiency in petitioner's Federal income tax resulting from his interpretation of section 965,[2] a one-time dividends received deduction for a U.S. corporation. The amount qualifying for the dividends received deduction is reduced by increased related party indebtedness under section 965(b)(3) (sometimes, related party debt rule). We must decide for the first time whether an account receivable established under Rev. Proc. 99-32, 1999-2 C.B. 296, may constitute increased related party indebtedness for purposes of the related party debt rule. We hold that it may.

FINDINGS OF FACT

The parties have stipulated some facts. We incorporate the stipulation of facts and the accompanying exhibits by this reference. Petitioner's principal place of business was Houston, Texas when it filed the petition.

I. <u>Petitioner and Related Entities</u>

Petitioner is a U.S. corporation that develops and licenses computer software. Petitioner is the common parent of a group of subsidiaries that joined in the filing of a consolidated Federal income tax return for the taxable year ended

---

[1]All amounts are rounded to the nearest million dollars.

[2]All section references are to the Internal Revenue Code for the years at issue, unless otherwise indicated.

March 31, 2006. Petitioner is also the parent of non-consolidated foreign affiliates. Petitioner's wholly-owned BMC Software European Holding (BSEH)[3] was a controlled foreign corporation (CFC) under section 957.

## II. Transfer Pricing Dispute

Petitioner and BSEH collaboratively developed software. Two cost-sharing agreements (CSAs) governed that relationship. Under the CSAs, they co-owned the software and each held exclusive distribution rights for certain territories. Petitioner terminated the CSAs by agreement in 2002 and took sole ownership of the software. Petitioner agreed to pay future royalties to BSEH and licensed to BSEH the software for distribution. Petitioner paid BSEH royalties required under the CSAs for 2002 through 2006.

Respondent examined the Federal income tax returns petitioner filed for 2002 through 2006. Respondent concluded that the royalty payments between petitioner and BSEH were not arm's length. Petitioner and respondent entered into a closing agreement in 2007 increasing petitioner's income (transfer pricing closing agreement) by $35 million for 2003, $23 million for 2004, $22 million for

---

[3]BSEH indirectly owned 100% of issued and outstanding shares of BMC Software Europe, an Irish corporation, and directly owned 100% of BMC Software Mauritius, a Mauritius corporation. Each has been treated as an entity disregarded by BSEH for Federal income tax purposes. For the purposes of this matter, we will treat these entities as one and refer only to BSEH.

2005 and $22 million for 2006 (collectively, primary adjustments). These primary adjustments represented net reductions in royalties petitioner paid BSEH. Respondent executed the transfer closing agreement on August 30, 2007.

The primary adjustments required petitioner to make secondary adjustments to conform its accounts. Those secondary adjustments would have been treated as deemed capital contributions from petitioner to BSEH except that petitioner elected to establish accounts receivable under Rev. Proc. 99-32, supra, for repayment. To that end, petitioner and respondent entered into another closing agreement (accounts receivable closing agreement) that established for Federal income tax purposes interest-bearing accounts receivable from BSEH to petitioner. Respondent executed the accounts receivable closing agreement also on August 30, 2007. The amounts of the accounts receivable corresponded to the amounts of the primary adjustments, including an account receivable for $22 million deemed established on March 31, 2005 and another for $22 million deemed established on March 31, 2006.

The accounts receivable bore interest at the applicable Federal rate. The interest was deductible from BSEH's taxable income and includible in petitioner's taxable income. The parties agreed as follows:

> BSEH will pay the account receivable, including interest thereon, by intercompany payment. Such payment will be free of the Federal income tax consequences of the secondary adjustments that would otherwise result from the primary adjustment; provided, the payment of the balance of the account, after taking into consideration any prepayment pursuant to section 4.02 of Rev. Proc. 99-32, is made within 90 days after execution of this closing agreement on behalf of the Commissioner.

BSEH paid the principal and the interest owed within 90 days of the accounts receivable closing agreement's becoming effective.

III. Petitioner's Repatriation and One-Time Dividends Received Deduction

Petitioner repatriated from BSEH $721 million invested outside the U.S. through a series of transactions between June 29, 2005 and March 31, 2006. Petitioner filed a Form 1120, U.S. Corporation Income Tax Return, for 2006. Petitioner claimed $709 million (repatriated dividends) as qualifying for the one-time dividends received deduction under section 965 on Form 8895, One-Time Dividends Received Deduction for Certain Cash Dividends from Controlled Foreign Corporations. Petitioner reported its CFC did not have increased indebtedness to petitioner or a related party between the close of the taxable year, March 31, 2006, and the close of October 3, 2004 (testing period).[4]

---

[4]The testing period with respect to petitioner is the period between March 31, 2006 and October 3, 2004 because petitioner made the election for the tax year ending March 31, 2006. As discussed below, the testing period is relevant

(continued...)

Respondent determined that $43 million of the repatriated dividends was ineligible for the dividends received deduction. Respondent concluded that the accounts receivable that were deemed established during the testing period constituted increased related party indebtedness. The remaining repatriated dividends qualified for deduction under section 965. Respondent issued the deficiency notice for 2006, and petitioner timely filed the petition.

OPINION

We must decide whether accounts receivable that were deemed established by a closing agreement under Rev. Proc. 99-32, supra, constitute increased related party indebtedness for purposes of section 965. Respondent concedes that petitioner did not establish the accounts receivable to fund the repatriated dividend. Thus, if the related party debt rule applies only to abusive transactions, as petitioner contends, then respondent incorrectly determined the deficiency. We consequently will consider the related party debt rule and whether an account receivable established under Rev. Proc. 99-32, supra, may constitute increased related party indebtedness.

---

[4](...continued)
because the amount of dividends eligible for deduction under sec. 965 is reduced by increased indebtedness between the close of the taxable year for which the election is in effect and October 3, 2004.

We then consider whether the parties agreed in the accounts receivable closing agreement that repayment of the accounts receivable was free from further Federal income tax consequences. Finally, we consider whether the accounts receivable that were deemed established during the testing period are taken into account when determining related party indebtedness.

## I. Dividends Received Deduction

We turn to whether petitioner's CFC had increased related party indebtedness as that term is intended in section 965(b)(3). Petitioner asserts that the related party debt rule applies only where the U.S. shareholder intentionally finances the dividend through an abusive transaction. Petitioner further argues that the accounts receivable cannot constitute indebtedness as that term is intended in section 965(b)(3). Respondent, on the other hand, argues that the accounts receivable constitute increased related party indebtedness because the related party debt rule is not limited to intentionally abusive transactions. Consequently, respondent and petitioner dispute whether accounts receivable are within the scope of section 965(b)(3) for increased related party indebtedness. To resolve this we must analyze section 965.

A.  Statutory Interpretation Principles

Our principal task when interpreting a statute is to ascertain and give effect to Congress' intent.  The statutory text is the most persuasive evidence of Congressional intent.  United States v. Am. Trucking Ass'ns, Inc., 310 U.S. 534, 542-543 (1940).  The plain language of a statute is ordinarily to be given effect unless to do so would produce an absurd or futile result, or an unreasonable result that plainly conflicts with legislative intent.  See United States v. Ron Pair Enters. Inc., 489 U.S. 235, 242 (1989); Wadlow v. Commissioner, 112 T.C. 247, 266 (1999).  We consider relevant legal authority and the statute's purpose and context.  Dolan v. USPS, 546 U.S. 481, 486 (2006).  We rely on legislative history to ascertain congressional intent only if a statute is silent or ambiguous. Burlington No. R.R. Co. v. Okla. Tax Comm'n, 481 U.S. 454, 461 (1987); Miss. Poultry Ass'n, Inc. v. Madigan, 992 F.2d 1359, 1364 n.28 (5th Cir. 1993).  Our initial inquiry is therefore whether the language of section 965(b)(3) is so plain as to permit only one reasonable interpretation to answer that question.  See, e.g., Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997).

B.  The Related Party Indebtedness Reduction of Section 965

We now turn to section 965 to interpret the dividends received deduction and the related party debt rule.  A corporation that is a U.S. shareholder of a CFC

may elect, for one taxable year, an 85% deduction with respect to certain cash dividends it receives from its CFC.[5]  Sec. 965(a).  The eligible amount is reduced by any increase in related party indebtedness during the testing period.[6]  Sec. 965(b)(3).

The parties dispute whether Congress meant the related party debt rule to apply only to increased indebtedness resulting from intentionally abusive transactions.  The related party debt rule provides in pertinent part that

> the amount of dividends which would * * * be taken into account under subsection (a) shall be reduced by the excess (if any) of--
>
> > (A) the amount of indebtedness of the controlled foreign corporation to any related person * * * as of the close of the taxable year for which the election * * * is in effect, over
>
> > (B) the amount of indebtedness of the controlled foreign corporation to any related person * * * as of the close of October 3, 2004.

---

[5]The deduction is limited to cash dividends that the U.S. corporation reinvested in the United States.  Sec. 965(b)(2) and (4).  Further, the dividends in excess of $500 million are eligible only if permanently invested outside the United States.  Sec. 965(b)(1).

[6]Respondent does not dispute that the repatriated dividends satisfied the other requirements of sec. 965.  The repatriated dividends did not exceed the amount of earnings reported on petitioner's applicable financial statement to be permanently reinvested outside the United States.  See sec. 965(b)(1)(B).  Petitioner reinvested the repatriated dividends pursuant to a domestic reinvestment plan.  See sec. 965(b)(4).

Sec. 965(b)(3). Petitioner contends this paragraph incorporates an intent requirement. We disagree. Increased related party indebtedness is calculated by determining the difference between the CFC's "amount of indebtedness" from the testing period's beginning and end. The rule does not include an intent requirement. Congress did not provide any exceptions to this arithmetic formula.

Petitioner points to flush language Congress later added conferring authority to issue regulations to prevent transactions that avoid the statute's purposes and exclude dividends attributable to a transfer between the U.S. corporation and its CFC. See Gulf Opportunity Zone Act of 2005, Pub. L. No. 109-135, sec. 403(q)(3), 119 Stat. at 2627. Petitioner argues that this grant of regulatory authority means Congress intended section 965(b)(3) to prevent only intentionally abusive transactions. Petitioner also keys on a snippet from the Joint Committee on Taxation technical explanation[7] to suggest that the related party debt rule applies only in cases in which the transfer is part of an arrangement undertaken with a principal purpose of avoiding the purposes of the related party

_____

[7]Petitioner emphasizes the following statement: "It is anticipated that dividends would be treated as attributable to a related-party transfer of cash or other property under this authority only in cases in which the transfer is part of an arrangement undertaken with a principal purpose of avoiding the purposes of the related-party debt rule of Code section 965(b)(3)."

debt rule.  See 151 Cong. Rec. S14028, S14050-S14051 (daily ed. Dec. 19, 2005). We disagree with petitioner's interpretation.

Congress did not amend the operative language of section 965(b)(3) when it added the flush language.  Nor do we interpret the grant of regulatory authority as circumscribing the scope of the related party debt rule.  Rather, the flush language conferred on the Secretary the discretion to promulgate supplemental regulations. A complete reading supports this conclusion.

The grant of regulatory authority "supplements existing circular cash flow principles" to stop cash or property transactions that "effectively" fund the dividend.  Id. at S14050.  Circular cash flows, by their nature, create a net zero effect.  This result, however, does not mean that all circular cash flow transactions are abusive.  Thus, supplemental regulations were to be aimed at preventing abusive circular transactions that would not register indebtedness under the arithmetic formula.  Id.  This reading is supported by the report's discussion of permissible circular transactions.  Id.  Congress therefore authorized regulations to distinguish between abusive and permissible circular transactions.

The flush language therefore does not muzzle the related party debt rule by adding an intent requirement.  Rather, Congress authorized regulations to supplement the related party debt rule to address abusive circular transactions.

The grant of regulatory authority is ultimately irrelevant here because the adjustments and repayment differ from a circular transaction. Thus, the related party debt rule does not have an intent requirement.

C. Indebtedness for Purposes of Section 965

Having determined that the related party debt rule does not include an intent requirement, we now address whether the accounts receivable are indebtedness within the meaning of section 965(b)(3). Petitioner contends that the accounts receivable are not indebtedness.[8] In contrast, respondent contends that we should interpret the term "indebtedness" under general Federal income tax principles. To do so would mean that the accounts receivable are indebtedness.

We now consider the meaning of the term "indebtedness" as it is used in section 965(b)(3). The Commissioner applied the same meaning as that term has under general Federal income tax principles. See Notice 2005-38, sec. 7.02(a), 2005-1 C.B. 1100, 1111. Respondent contends that the term simply means debt. We may consider dictionary definitions to understand the meaning that Congress may have intended. See, e.g., Dixon v. Commissioner, 132 T.C. 55, 76 (2009)

---

[8]Respondent determined that the 2005 and 2006 accounts receivable increased the related party indebtedness for the testing period. The parties agree that the relevant period is between October 3, 2004 and March 31, 2006, the close of the taxable year for which the election was in effect.

(applying dictionary definition of "incurred" for purposes of interpreting section 6673(a)(2)). Indebtedness is defined as "[t]he condition or state of owing money" or "[s]omething owed; a debt." Black's Law Dictionary 783 (8th ed. 2004). Petitioner does not offer, nor do we contemplate, another reasonable interpretation in the related party context of section 965(b)(3). And respondent's definition is consistent with the term's plain meaning. We hold that the term "indebtedness" as it is used in section 965(b)(3) means the condition of owing money or being indebted.

We now consider whether an account receivable established under Rev. Proc. 99-32, supra, falls within that definition. The term "account receivable" is not defined in Rev. Proc. 99-32, supra, or the accounts receivable closing agreement. The revenue procedure calls for the taxpayer to establish an "account receivable" bearing an arm's-length interest rate. Rev. Proc. 99-32, secs. 1, 4.01(2), 1999-2 C.B. at 297, 299. The CFC must satisfy the account within 90 days of the closing agreement's becoming effective. Id. sec. 4.01(4). Account receivable is defined as "[a]n account reflecting a balance owed by the debtor." Black's Law Dictionary 18. Petitioner observed those requirements and included only the interest payments as income. The characteristics described under Rev. Proc. 99-32, supra, and petitioner's treatment of the accounts receivable are

consistent with the dictionary definition. We hold that accounts receivable established under Rev. Proc. 99-32, supra, may constitute indebtedness for purposes of section 965.

D. Trade Payables Exception

We next consider petitioner's argument that the accounts receivable, even if indebtedness, should nonetheless be exempt from section 965(b)(3) because they are trade payables. See Notice 2005-38, sec. 7.02(b); Notice 2005-64, sec. 10.08, 2005-2 C.B. 471, 489. The trade payable exception excludes indebtedness that arises in the ordinary course of a business from sales, leases, licenses or the rendition of services provided to or for a CFC by a related person from the related party debt rule. Id. The indebtedness must be actually paid within 183 days. Id. If the accounts receivable are trade payables, then those amounts could not be increased related party indebtedness. If not, then the accounts receivable could be increased related party indebtedness.

Respondent argues that the accounts receivable are not trade payables because they were not established in the ordinary course of business or paid within 183 days after the payables were created. We agree. The accounts receivable were created after a section 482 adjustment rather than resulting from ordinary business. Further, the relevant accounts receivable were paid more than a year

after each was deemed established. The trade payables exception does not apply. The accounts receivable therefore are increased indebtedness.

E. Related Party Debt Rule Conclusion

In sum, the related party debt rule does not have an intent requirement. The accounts receivable may be indebtedness.

II. The Federal Income Tax Consequences of the Accounts Receivable

We now consider the effect of the accounts receivable closing agreement provision that the payment would be free of the Federal income tax consequences of the secondary adjustments that would otherwise result from the primary adjustment. Petitioner contends that the accounts receivable closing agreement precludes any further Federal income tax consequences resulting from the repayment. The accounts receivable therefore would be excluded when determining the amount of the dividend received deduction. Respondent contends that the accounts receivable closing agreement provision allows petitioner to substitute the tax consequences of the debt secondary adjustment for those of the deemed capital contribution secondary adjustments. Put another way, the accounts receivable would be established for all Federal income tax purposes with petitioner avoiding the consequences of the repayment for a deemed capital contribution. We agree with respondent.

The accounts receivable stemmed from the primary adjustment agreed to in the transfer pricing closing agreement. A primary adjustment under section 482 requires a secondary adjustment to conform a taxpayer's accounts. Sec. 1.482-1(g)(3), Income Tax Regs. A secondary adjustment is typically treated as a dividend or a capital contribution. Id. Thus, petitioner was obligated to conform its accounts with secondary adjustments.

The regulations authorize in certain circumstances a taxpayer's "*repayment of the allocated amount without further income tax consequences.*"[9] Id. (emphasis added). And the Commissioner promulgated Rev. Proc. 99-32, supra, for this purpose. An eligible taxpayer may transfer funds attributable to a primary adjustment via an account receivable "without the Federal income tax consequences of the secondary adjustments that would otherwise result from the primary adjustment."[10] Rev. Proc. 99-32, sec. 2, 1999-2 C.B. at 298. The

---

[9]Sec. 1.482-1(g)(3), Income Tax Regs., provides that "[a]ppropriate adjustments must be made to conform a taxpayer's accounts to reflect allocations made under section 482. Such adjustments may include the treatment of an allocated amount as a dividend or a capital contribution (as appropriate), or, in appropriate cases, pursuant to such applicable revenue procedures as may be provided by the Commissioner * * *, repayment of the allocated amount without further income tax consequences."

[10]This provision states in whole that

(continued...)

accounts receivable closing agreement tracked that language by providing that

BSEH's payment to petitioner would "be free of the Federal income tax

consequences of the secondary adjustments that would otherwise result from the

primary adjustment." It also provided that it was "determined and agreed" that the

interest-bearing accounts receivable would be established for Federal income tax

purposes. Thus, we must determine the effect of the accounts receivable closing

agreement on the repayment's collateral consequences.

We previously concluded that an account receivable established under Rev.

Proc. 65-17, 1965-1 C.B. 833 (the predecessor to Rev. Proc. 99-32, supra), and

after a section 482 adjustment, did not preclude all collateral Federal income tax

consequences. See Schering Corp. v. Commissioner, 69 T.C. 579 (1978). The

taxpayer in Schering was a U.S. corporation that established accounts receivable

by closing agreement to be "free of further Federal income tax consequences." Id.

_____

[10](...continued)
Absent a United States taxpayer's election of treatment under this
revenue procedure, an adjustment under section 482 (the "primary
adjustment") entails secondary adjustments to conform the taxpayer's
accounts to reflect the primary adjustment. These secondary
adjustments may result in adverse tax consequences to the taxpayer.
* * * This revenue procedure allows the United States taxpayer to
repatriate the cash attributable to a primary adjustment via an account
without the Federal income tax consequences of the secondary
adjustments that would otherwise result from the primary adjustment.
[Rev. Proc. 99-32, sec. 2, 1999-2 C.B. 296, 298.]

at 580-583. The taxpayer's CFC declared a dividend to satisfy the account receivable. Id. at 584. The relevant foreign tax authority treated the CFC's payment as a dividend. Id. at 585. The taxpayer claimed a foreign tax credit under section 901 for the foreign tax paid on the dividend attributable to the principal and interest. Id. at 588. The Commissioner disallowed the credit claimed for the tax applied to the principal. Id. The Commissioner argued that the foreign tax credit was a tax consequence the closing agreement precluded because the closing agreement did not specifically provide that the taxpayer could claim the credit for the amount representing the adjustment. Id. at 594-595.

We disagreed with the Commissioner that the closing agreement precluded all collateral consequences. Rather, we concluded that the repayment was no longer considered a deemed dividend for Federal income tax purposes. Id. at 598. We reasoned that the applicable revenue procedure and corresponding closing agreement were intended to allow the tax-free repatriation of money allocated to the taxpayer by section 482. Id. at 595. And, indeed, the taxpayer treated the repayment as a return of principal and excluded that amount from its income. Id. at 598.

Our holding in Schering was predicated on two concepts. First, the closing agreement characterized the payment for Federal income tax purposes

notwithstanding the foreign tax authority's dividend treatment. The Commissioner and the taxpayer were bound to treat the payment as a return of principal for all Federal income tax purposes and the repayment was no longer a dividend. In short, we did not permit inconsistent characterizations for Federal income tax purposes.

Second, the closing agreement determined that the taxpayer avoided the tax consequences of the secondary adjustments absent the election. The collateral consequences would be determined by applying the characterization for all Federal income tax purposes. The closing agreement did not preclude all tax consequences.

These principles apply to our interpretation of the accounts receivable closing agreement. We find it significant that "repayment," not the accounts receivable, was free of consequences that "would otherwise" result from the primary adjustment. This indicates that the taxpayer avoids the consequences that would have resulted absent the election. It is undisputed that the deemed capital contribution from petitioner to BSEH was a secondary adjustment that would otherwise have resulted from the primary adjustment. The parties further agree that an eliminated "Federal income tax consequence" of that secondary adjustment included the taxable dividend petitioner would have received upon cash payment

from BSEH equal to the deemed capital contribution. Such a secondary adjustment would have been subject to tax with the entire amount consequently included in petitioner's income. It is this adverse tax consequence that the election avoided.

Petitioner also argues that Rev. Proc. 99-32, supra, sets forth procedures that are equitable and that the secondary accounts receivable adjustments did not, nor were intended to, fund the repatriated dividends. We agree that the procedures set forth in Rev. Proc. 99-32, supra, are equitable inasmuch as the taxpayer may avoid the tax consequences from deemed capital contribution or dividend treatment. See Schering Corp. v. Commissioner, 69 T.C. at 597. We disagree, however, that the election allows for inconsistent characterizations for Federal tax purposes. As previously discussed, petitioner avoided the consequences of the potential secondary adjustments by agreeing to establish accounts receivable for all Federal income tax purposes.

We read the accounts receivable closing agreement to mean that petitioner's election relieved it from the tax consequences that would have resulted absent the election. Further, we hold that the accounts receivable are deemed established for all Federal tax purposes.

III. Increased Indebtedness in the Testing Period

We now address whether there was increased indebtedness during the testing period because the accounts receivable were deemed established after the testing period. Petitioner reasons that the deductible amount should not be retroactively reduced because the accounts receivable were established after petitioner repatriated the funds. Respondent argues, in contrast, that the parties agreed that the accounts receivable were deemed established during the testing period and the amount of dividends eligible for the deduction should accordingly be reduced. We agree with respondent.

The Commissioner may enter into a written closing agreement with a taxpayer relating to the liability of the person for any taxable period ending before or after the date of the agreement. Sec. 7121; Hudock v. Commissioner, 65 T.C. 351, 362 (1975); sec. 301.7121-1(a), Proced. & Admin. Regs. A closing agreement relating to a prior taxable period may relate to one or more separate items affecting the tax liability of the taxpayer. Sec. 301.7121-1(b)(2), Proced. & Admin. Regs. Some closing agreements decide only specific issues and bind the parties only as to those issues. See Manko v. Commissioner, 126 T.C. 195, 201-202 (2006); Estate of Magarian v. Commissioner, 97 T.C. 1, 5 (1991).

The accounts receivable closing agreement determined for all Federal income tax purposes that petitioner would establish interest-bearing accounts receivable from BSEH to petitioner. It further provided that two of the accounts receivable were deemed to have been established during the testing period. We therefore hold that the accounts receivable qualify as indebtedness during the testing period because petitioner and respondent agreed that they were established then.

IV. Conclusion

We hold that the accounts receivable constitute indebtedness for the purposes of section 965(b)(3). We further hold that the accounts receivable closing agreement permits petitioner to avoid the Federal income tax consequences that would otherwise have resulted absent establishing the accounts receivable and does not preclude reducing the dividends received deduction under section 965(b)(3). We therefore sustain respondent's determination.

In reaching these holdings, we have considered all of the parties' arguments, and, to the extent not addressed here, we conclude that they are moot, irrelevant or without merit.

To reflect the foregoing,

Decision will be entered for

respondent.