T.C. Memo. 2021-39

UNITED STATES TAX COURT

JOHN K. CRANDALL AND NIVES M. CRANDALL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9203-17.                    Filed March 29, 2021.

<u>Frank Agostino</u>, <u>Phillip J. Colasanto</u>, and <u>Lawrence A. Sannicandro</u>, for
petitioners.

<u>Brian E. Derdowski, Jr.</u>, and <u>Brian J. Bilheimer</u>, for respondent.

MEMORANDUM OPINION

VASQUEZ, <u>Judge</u>:  For taxable year 2011 respondent determined a

deficiency in Federal income tax of $6,661 and a section 6662(a) accuracy-related

[*2] penalty of $1,332.[1]  The issue for decision is whether the parties' closing agreement precludes the determined deficiency and penalty.  We resolve this issue in petitioners' favor.

## Background

The parties submitted this case fully stipulated under Rule 122.  Our findings of fact consist of the stipulated facts and facts drawn from the stipulated exhibits.  We incorporate the stipulation of facts and accompanying exhibits by this reference.  Petitioners, husband and wife, resided in New Jersey when the petition in this case was filed.

## I.     Petitioners' Background

Petitioner wife is a dual citizen of the United States and Italy.  During all relevant years petitioners split their time between those countries, residing in Italy for six to eight months per year and New Jersey for four to six months per year.  For a period not established by the record, petitioner wife worked for the Italian Government and became eligible for a pension.

---

[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.  Title 26 refers to title 26 of the United States Code, i.e., the Internal Revenue Code.

**[*3]** II.  <u>Tax Reporting</u>

During taxable years 2003 through 2011 petitioners received foreign-source pension income, interest income, and ordinary dividends. For each of those years they paid Italian income tax.

Petitioners filed joint Forms 1040, U.S. Individual Income Tax Return, for taxable years 2003 through 2010. On those returns petitioners failed to report portions of their foreign-source pension income, interest income, and ordinary dividends. In 2011 or 2012 petitioners retained counsel to facilitate their entry into the Internal Revenue Service (IRS) Offshore Voluntary Disclosure Program (OVDP).[2]

---

[2] The IRS Criminal Investigation Division (CID) maintains a longstanding practice of voluntary disclosure whereby taxpayers can generally avoid criminal prosecution by timely and completely disclosing their noncompliance to CID. <u>Awad v. Commissioner</u>, T.C. Memo. 2017-108, at *5 n.3; <u>see</u> Offshore Voluntary Disclosure Program Frequently Asked Questions and Answers 2014, Q&A-3. In March 2009 the IRS launched the OVDP, a "counterpart" to this practice whereby taxpayers who timely disclosed ownership of unreported foreign bank accounts were eligible for reduced monetary penalties. <u>Awad v. Commissioner</u>, at *5 n. 3; <u>see</u> Offshore Voluntary Disclosure Program Frequently Asked Questions and Answers 2014, Q&A-3. Several iterations of the OVDP were generally in effect from 2009 to September 2018. <u>See</u> Closing the 2014 Offshore Voluntary Disclosure Program Frequently Asked Questions and Answers, Q&A-1 & 2; Offshore Voluntary Disclosure Program Frequently Asked Questions and Answers 2014, Q&A-1.

**[*4]** In October 2012 petitioners filed a joint Form 1040 for taxable year 2011. On that return they reported $63,902 of foreign-source pensions and annuities, dividends, and interest income. They also claimed a foreign tax credit (FTC) of $14,156. Besides the FTC petitioners claimed no credit on their 2011 Form 1040.

III.   OVDP

In November 2012 petitioners entered the OVDP via a written submission disclosing their underreporting of foreign-source taxable income for 2003 through 2011. Petitioners included with their written submission a Form 1040X, Amended U.S. Individual Income Tax Return, for each of those years. Petitioners also submitted nine separate check payments covering additional tax and interest for each amended return year. On their Forms 1040X for 2003 through 2010 petitioners reported additional foreign-source income in amounts ranging from $38,865 to $69,037. They also claimed FTCs in amounts ranging from $8,200 to $14,563.

On their 2011 Form 1040X petitioners increased their foreign-source income by $496. They also claimed an FTC of $14,279, which increased the amount claimed on their original return by $123. As a result of these changes, petitioners' reported tax increased by $49.

**[*5]** IRS Examination personnel reviewed petitioners' OVDP submission and did not accept petitioners' Forms 1040X as filed. Between July 2013 and May 2015, petitioners and Examination personnel exchanged information and documents pertaining to petitioners' tax liabilities for 2003 through 2011. Petitioners and Examination personnel sought to resolve their issues by agreement.

IV.    May 2015 Revenue Agent Report

On May 1, 2015, Revenue Agent (RA) Chris Young faxed petitioners' counsel a revenue agent report (RAR) for taxable years 2003 through 2011 (May-15 RAR). For each of those years the May-15 RAR proposed a deficiency greater than the increased tax reported on the Form 1040X. These discrepancies largely arose from RA Young's allowing lesser FTCs than petitioners had claimed on the Forms 1040X. For example, while petitioners claimed an FTC of $14,563 on their 2010 Form 1040X, the May-15 RAR proposed an FTC of $1,791 for that year.

For 2011 the May-15 RAR similarly proposed a lesser FTC ($2,165) than petitioners had claimed on their Form 1040 and Form 1040X ($14,156 and $14,279, respectively). However, RA Young also inadvertently allowed petitioners a prior year alternative minimum tax credit (minimum tax credit) of

[*6] $6,661,[3] partially offsetting the downward adjustment to the 2011 FTC.

These and other adjustments[4] resulted in a proposed deficiency of $4,382, a

section 6662(a) accuracy-related penalty of $876, and a section 6651(a)(1)

addition to tax of $145 for 2011.

On June 11, 2015, petitioners sent RA Young a check payment of $111,276

comprising, in part, the May-15 RAR amount due for 2011 less the amount

petitioners had paid with their Form 1040X for that year.[5]

V.      Closing Agreement

In July 2015 RA Young sent petitioners an original and two copies of a

Form 906, Closing Agreement on Final Determination Covering Specific Matters

(closing agreement).  Petitioners signed the closing agreement on July 22, 2015,

and mailed it to RA Young on July 27, 2015.

---

[3] Petitioners did not claim a prior year minimum tax credit on their Form
1040 or Form 1040X for 2011.

[4] In the May-15 RAR, RA Young accepted the $496 adjustment to income
that petitioners had reported on their 2011 Form 1040X.

[5] Petitioners included with their Forms 1040X check payments totaling
$47,866 for 2003 through 2011.  The May-15 RAR did not credit petitioners with
those payments and proposed deficiencies, penalties, additions to tax, and interest
totaling $159,142 for 2003 through 2011.  The June 11, 2015, check payment of
$111,276 equals the difference between the latter and former amounts ($159,142 –
$47,866).

**[*7]**  The parties' closing agreement refers to petitioner husband and petitioner wife as "Taxpayer".  It contains several recitals, which are introductory, explanatory clauses beginning with the word "WHEREAS".  See Rev. Proc. 68-16, sec. 6.05(3), 1968-1 C.B. 770, 779.  Those recitals relevant to our analysis are as follows:

> WHEREAS, Taxpayer underreported federal income taxes for tax years 2003 through 2011 through offshore financial arrangements (including arrangements with foreign banks, financial institutions, corporations, partnerships, trusts, or other entities);
>
> WHEREAS, Taxpayer has made a voluntary disclosure of the facts relating to their underreporting of federal income taxes through offshore financial arrangements;
>
> *         *         *         *         *         *         *
>
> WHEREAS, Taxpayer paid or accrued foreign income taxes to Italy and various other countries during taxable years 2003 through 2011;
>
> WHEREAS, Taxpayer wants to resolve for 2003 through 2011 the proper amount of federal income taxes and applicable penalties, with payment of agreed liabilities for tax, penalties, and interest on terms acceptable to the Internal Revenue Service[.]

After the recitals, a caption states:  "NOW IT IS HEREBY DETERMINED AND AGREED FOR FEDERAL TAX PURPOSES THAT".  Ten numbered paragraphs follow the caption.

[*8]   The first of those paragraphs states that the agreement "applies to Taxpayer's additional tax liability relating to Taxpayer's voluntary disclosure of foreign source assets and income made to the Internal Revenue Service pursuant to the 2012 Offshore Voluntary Disclosure Program."  It then states that petitioners "had additional unreported income and overstated deductions for tax years 2003 through 2011 relating to the voluntary disclosure as follows".  What follows is a table of adjustments, reproduced in full below:

| Item/Issue | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| Pension Income (Net Adjustment) | ($ 7,945.00) | ($8,822.00) | ($ 7,543.00) | ($ 8.686.00) | ($ 9,857.00) |
| Ordinary Dividends | $ 956.00 | $ 1,395.00 | $ 1,612.00 | $ 1,909.00 | $ 2,450.00 |
| Pension Income | $33,880.00 | $37,126.00 | $33,602.00 | $38,140.00 | $43,381.00 |
| Taxable Interest | $ 7,432.00 | $ 5,401.00 | $ 8,361.00 | $ 8,867.00 | $11,350.00 |
| Itemized Deductions | $ 0.00 | ($ 44.00) | $ 0.00 | ($ 793.00) | ($ 548.00) |
| Exemptions | $ 0.00 | $ 0.00 | $ 0.00 | $ 1,320.00 | $ 1,723.00 |
| Social Security RRB | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 1.00 |
| Capital Gain/(Loss) | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | ($ 46.00) |

| Item/Issue | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| Pension Income (Net Adjustment) | ($ 9,434.00) | ($ 9,499.00) | ($ 8,657.00) | $ 0.00 |
| Ordinary Dividends | $ 3,075.00 | $ 1,051.00 | $ 1,051.00 | ($100.00) |
| Pension Income | $40,993.00 | $44,570.00 | $40,430.00 | $ 596.00 |
| Taxable Interest | $11,727.00 | $15,428.00 | $17,038.00 | $ 0.00 |
| Itemized Deductions | $ 463.00 | $ 520.00 | $ 92.00 | $ 0.00 |
| Exemptions | $ 794.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| Social Security RRB | $ 0.00 | $ 1.00 | $ 0.00 | $ 0.00 |
| Capital Gain/(Loss) | $ 0.00 | $ 516.00 | $11,291.00 | $ 0.00 |

Paragraphs 2 and 5 of the closing agreement address petitioners' liability for penalties and additions to tax.  In paragraph 2 the parties agree that section 6662(a) accuracy-related penalties and section 6651(a)(1) additions to tax apply to

[*9] the underpayments attributable to the above-listed adjustments.  The parties also agree in paragraph 5 that the IRS can assess a title 26 miscellaneous offshore penalty of $34,289 for taxable year 2010.[6]

Paragraph 3 of the closing agreement addresses petitioners' payment of foreign income tax and their eligibility for FTCs.  It states that petitioners "paid or accrued foreign income taxes to Italy and various other countries eligible for foreign tax credit under section 901 of the Internal Revenue Code as follows".  What follows is another table, reproduced in full below:

| Year | 2003 | 2004 | 2005 | 2006 |
| --- | --- | --- | --- | --- |
| Foreign income taxes paid or accrued | $997.00 | $789.00 | $985.00 | $1,521.00 |

| Year | 2007 | 2008 | 2009 | 2010 |
| --- | --- | --- | --- | --- |
| Foreign income taxes paid or accrued | $1,876.00 | $1,290.00 | $1,736.00 | $1,791.00 |

---

[6] The OVDP required participants to pay a miscellaneous offshore penalty "in lieu of all other penalties that may apply to the undisclosed foreign accounts, assets and entities".  Offshore Voluntary Disclosure Program Frequently Asked Questions and Answers 2014, Q&A-7.  The parties stipulated that the June 11, 2015, payment included the miscellaneous penalty.  However, a stipulated exhibit indicates that the miscellaneous penalty was unpaid as of July 13, 2015.  Another stipulated exhibit indicates that petitioners' counsel included a check payment for the miscellaneous penalty with the signed closing agreements he sent to RA Young on July 27, 2015.  Accordingly, we find that the miscellaneous penalty was paid on July 27, 2015, rather than June 11, 2015.

[*10] The above table contains no entry for 2011, which is not referenced anywhere else in paragraph 3. The record does not explain the omission of 2011 from paragraph 3.

Paragraph 4 also addresses the FTC issue but, in contrast to paragraph 3, references 2011. It states: "During tax years 2003 through 2011, Taxpayer was entitled to foreign tax credit under section 901 of the Internal Revenue Code for foreign income taxes paid or accrued to a foreign country or U.S. possession." However, paragraph 4 does not specify the amount of FTC to which petitioners are entitled for 2011.

Paragraph 8 states that the agreement does not prevent the IRS "from auditing Taxpayer for tax years 2003 through 2011 and proposing adjustments unrelated to offshore financial arrangements." Paragraph 8 also permits the IRS to propose adjustments "related to offshore financial arrangements not included in Taxpayer's voluntary disclosure referred to in paragraph 1" of the agreement.

After the numbered paragraphs the closing agreement states that it "contains the complete agreement between the parties" and "is final and conclusive" except in the event of fraud, malfeasance, misrepresentation of material fact, or other occurrences not here relevant. The agreement contains no references to the May-15 RAR or the proposed adjustments therein. Nowhere in the agreement do

[*11] the parties specify the amount of FTC to which petitioners are entitled for 2011.

VI.     Assessment and Subsequent Abatement

Petitioners' June 11, 2015, payment was based on the amounts shown as due in the May-15 RAR, which proposed a deficiency of $4,382 for 2011.[7]  The June 11, 2015, payment preceded the execution of the closing agreement, which petitioners signed in July 2015.  On September 8, 2015, Technical Services Group Manager Kory E. Campbell signed the agreement on behalf of the IRS.

In November 2015 the IRS assessed additional income tax of $11,043 and an accuracy-related penalty of $2,209 for 2011.  The assessment of additional income tax exceeded the May-15 RAR's proposed deficiency by $6,661, which is the same amount as the prior year minimum tax credit RA Young had accidentally allowed petitioners.  Thus, the November 2015 assessment appears to have been based on the proposed adjustments in the May-15 RAR except for the allowance of the prior year minimum tax credit.

---

[7] As explained supra part IV, the proposed deficiency largely arose from the allowance of a lesser FTC ($2,165) than petitioners had claimed on their Form 1040 and Form 1040X ($14,156 and $14,279, respectively).  However, the effect of the FTC reduction was mitigated by RA Young's inadvertent allowance of an unclaimed prior year minimum tax credit of $6,661.

**[\*12]** The IRS issued petitioners a bill for 2011 reflecting the above-described assessment. Petitioners disputed the assessment and filed a Form 911, Request for Taxpayer Advocate Service Assistance, with the IRS Taxpayer Advocate Service.

On August 22, 2016, the IRS partially abated the assessment by reducing petitioners' 2011 income tax by $6,661 and the corresponding accuracy-related penalty by $1,332. That same day the IRS issued petitioners a Notice CP21C for 2011 showing a balance due of zero after the partial abatements.

VII.  Subsequent Examination Activity and Statutory Notice of Deficiency

After the partial abatement of tax, the IRS either opened an examination of petitioners' 2011 return or reopened the review of petitioners' OVDP submission. The matter was assigned to RA Young.

On February 3, 2017, respondent issued petitioners a notice of deficiency determining a deficiency of $6,661 and accuracy-related penalty of $1,332 for 2011. Respondent attached to the deficiency notice a "Statutory Notice Explanation of Items", which states: "It is determined that the prior year minimum tax credit is overstated in the amount of $6,661.00 for the tax year ended December 31, 2011. Taxpayers have not provided substantiation to show that they are entitled to this credit." As stated above, petitioners never claimed a prior year minimum tax credit on their Form 1040 or Form 1040X for 2011.

**[\*13]** However, an RAR attached to the deficiency notice (February-17 RAR) reveals that the deficiency actually arose from a downward adjustment to petitioners' FTC. The February-17 RAR allowed petitioner an FTC of $2,165 rather than $14,156, the amount petitioners had claimed on their Form 1040.[8] The notice of deficiency does not include an explanation for the FTC reduction.

On February 21, 2017, petitioners sent respondent a section 6603 deposit of $9,310.[9] Respondent applied the deposit to petitioners' income tax account for 2011, resulting in a credit balance of $9,310 as of February 24, 2017.

Petitioners timely filed a petition on April 28, 2017.

## Discussion

### I. Jurisdiction

The Tax Court is a court of limited jurisdiction, and we may exercise our jurisdiction only to the extent provided by Congress. See sec. 7442; GAF Corp. &

---

[8] This adjustment is identical to the adjustment proposed in the May-15 RAR. Unlike the May-15 RAR, the February-17 RAR did not allow petitioners a prior year minimum tax credit that they had never claimed, resulting in a larger deficiency.

[9] Sec. 6603(a) permits taxpayers to "make a cash deposit with the Secretary which may be used by the Secretary to pay any tax imposed under subtitle A or B * * * which has not been assessed at the time of the deposit." For purposes of sec. 6601 (relating to interest on underpayments), a tax to which a deposit is applied shall be treated as paid on the date the deposit is made. Sec. 6603(b).

[*14] <u>Subs. v. Commissioner</u>, 114 T.C. 519, 521 (2000). We have jurisdiction to redetermine a deficiency if a valid notice of deficiency is issued by the Commissioner and if a timely petition is filed by the taxpayer. <u>Rochelle v. Commissioner</u>, 116 T.C. 356, 358 (2001), <u>aff'd per curiam</u>, 293 F.3d 740 (5th Cir. 2002); <u>GAF Corp. & Subs. v. Commissioner</u>, 114 T.C. at 521. We also have jurisdiction to determine the amount of any overpayment a taxpayer made for a year that is properly before the Court on a petition to redetermine a deficiency. Sec. 6512(b)(1). If we determine that there is an overpayment and further determine the amount of the overpayment that is refundable in accordance with section 6512(b)(3), the overpayment amount thus determined "shall, when the decision of the Tax Court has become final, be credited or refunded to the taxpayer." Sec. 6512(b)(1).

Section 7522(a) requires that a deficiency notice "describe the basis for, and identify the amounts (if any) of, the tax due, interest, additional amounts, additions to the tax, and assessable penalties included in such notice." However, "[a]n inadequate description * * * shall not invalidate such notice." <u>Id.</u> This Court has held that a deficiency notice is valid if it objectively places a reasonable taxpayer on notice that the Commissioner has determined a deficiency in tax for a particular year and amount. <u>Dees v. Commissioner</u>, 148 T.C. 1, 6 (2017).

**[\*15]** The notice of deficiency in this case does not clearly describe the adjustments underlying the deficiency.[10] However, the notice clearly reflects respondent's determination that petitioners have a deficiency in income tax of $6,661 for 2011. Thus, the notice is valid despite respondent's confusing description of the underlying adjustments. Because petitioners timely petitioned this Court after receiving the notice, we have jurisdiction.

## II.     Burden of Proof

The fact that a case has been submitted under Rule 122(a) "does not alter the burden of proof, or the requirements otherwise applicable with respect to adducing proof, or the effect of failure of proof." Rule 122(b). Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer has the burden of proving it incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). We decide this case without regard to the burden of proof.

---

[10] The notice contains several attachments including a "Statutory Notice Explanation of Items" and the February-17 RAR. The "Statutory Notice Explanation of Items" indicates that the deficiency arose from petitioners' inability to establish their entitlement to a $6,661 prior year minimum tax credit they had not claimed but which RA Young had inadvertently taken into account. However, the February-17 RAR reveals that the deficiency arose not from that item but from respondent's determining an FTC of $2,165 rather than $14,156 (as claimed on the 2011 Form 1040).

**[\*16]** III.     Closing Agreement

     A.     The Parties' Contentions

The parties agree that they properly executed the closing agreement and that it is an enforceable agreement between them.  Neither party seeks to void or rescind the closing agreement.  They disagree, however, about the agreement's effect on the 2011 FTC.

Petitioners assert, among other arguments,[11] that the closing agreement includes the parties' agreement not to adjust the FTC claimed on petitioners' 2011 return.  According to petitioners, that agreement precludes respondent's adjustment to the FTC in the deficiency notice.

Respondent recognizes that the closing agreement does not adjust petitioners' 2011 FTC.  Respondent argues that the absence of such an adjustment indicates that there was no agreement about the correct amount of FTC for 2011.  According to respondent, the closing agreement does not prohibit a "subsequent" adjustment to that item.  We must therefore decide whether the closing agreement permits respondent to make a subsequent adjustment to petitioners' FTC for 2011.

---

[11]  On brief petitioners advance several alternative arguments.  One such argument is that the closing agreement incorporated the May-15 RAR's allowance of the prior year minimum tax credit and the resulting computation of petitioners' 2011 tax liability.  Because we hold for petitioners on other grounds, we need not consider the merits of this or other alternative arguments.

**[\*17]** B. <u>General Principles</u>

The Commissioner is authorized to fully settle tax liabilities through a closing agreement with any person regarding his or her liability for any taxable period. Sec. 7121(a); <u>Urbano v. Commissioner</u>, 122 T.C. 384, 393 (2004). Section 7121 sets forth the exclusive means by which a closing agreement between the Commissioner and a taxpayer may be accorded finality. <u>Urbano v. Commissioner</u>, 122 T.C. at 393. Closing agreements are final, conclusive, and binding on the parties as to matters agreed upon, <u>Analog Devices, Inc. v. Commissioner</u>, 147 T.C. 429, 445 (2016), and may not be annulled, modified, set aside, or disregarded in any suit or proceeding unless there is a "showing of fraud or malfeasance, or misrepresentation of a material fact", <u>see</u> sec. 7121(b).

All closing agreements must be executed on forms prescribed by the Commissioner. <u>Urbano v. Commissioner</u>, 122 T.C. at 393; sec. 301.7121-1(d), Proced. & Admin. Regs. Section 601.202(b), Statement of Procedural Rules, provides that the Commissioner will use one of two forms for closing agreements: (1) Form 866, Agreement as to Final Determination of Tax Liability, generally used to determine conclusively a taxpayer's total tax liability for a taxable period; and (2) Form 906, which is the type at issue here, generally used if the agreement relates to one or more separate items affecting the tax liability of a taxpayer. <u>See</u>

- 18 -

[*18] also Urbano v. Commissioner, 122 T.C. at 393; Zaentz v. Commissioner, 90

T.C. 753, 760-761 (1988). The Commissioner must issue a notice of deficiency

before assessing liabilities based upon agreed adjustments in a Form 906. Manko

v. Commissioner, 126 T.C. 195, 203-204 (2006).

The scope of a closing agreement is strictly construed to encompass only the

issues enumerated in the agreement itself. Analog Devices, Inc. v. Commissioner,

147 T.C. at 445-446. Any recitals in a closing agreement are not binding on the

parties. See id. at 446. However, recitals are explanatory and can give insight into

the intent of the parties. See Estate of Magarian v. Commissioner, 97 T.C. 1, 5

(1991); see also Rev. Proc. 68-16, sec. 6.05(3) ("It is important to distinguish

between matters which are merely informative and explanatory and matters which

are being agreed upon. The former should be segregated from the latter and

should ordinarily be reflected in the introductory recitals contained in the

WHEREAS clauses[.]").

Closing agreements are contracts, and they are subject to the rules of

Federal common law contract interpretation.[12] See Analog Devices, Inc. v.

---

[12] Absent a contrary written stipulation, this case is appealable to the Court of Appeals for the Third Circuit. See sec. 7482(b)(1)(A). To the extent that court's caselaw differs from our own, we would defer to the Court of Appeals. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th

(continued...)

[*19] <u>Commissioner</u>, 147 T.C. at 446.  Contracts are construed according to the intent of the parties as of the time of entering into the agreement.  <u>Long v. Commissioner</u>, 93 T.C. 5, 10 (1989), <u>aff'd without published opinion</u>, 916 F.2d 721 (11th Cir. 1990).  The starting point for ascertaining the parties' intent is the contract itself.  <u>See</u> <u>Baldwin v. Univ. of Pittsburgh Med. Ctr.</u>, 636 F.3d 69, 76 (3d Cir. 2011) ("The strongest objective manifestation of intent is the language of the contract.").  The contract must be read as a whole, and the contract must be interpreted in context.  <u>See</u> <u>Senior Exec. Benefit Plan Participants v. New Valley Corp. (In re New Valley Corp.)</u>, 89 F.3d 143, 149 (3d Cir. 1996).  That is because "[t]he meaning of words * * * commonly depends on their context[.] * * * When the parties have adopted a writing as a final expression of their agreement, interpretation is directed to the meaning of that writing in the light of the circumstances."  <u>Analog Devices, Inc. v. Commissioner</u>, 147 T.C. at 446 (quoting 2 Restatement, Contracts 2d, sec. 202, cmt. b (1981)).

Intent is inferred from the four corners of the agreement where the contract is unambiguous; extrinsic evidence may be used to discern intent where the contract has ambiguities.  <u>Rink v. Commissioner</u>, 100 T.C. 319, 325 (1993), <u>aff'd</u>,

_____

¹²(...continued)
Cir. 1971).

**[*20]** 47 F.3d 168 (6th Cir. 1995). The Court of Appeals for the Third Circuit has stated that a court cannot "simply determine whether, from * * * [its] point of view, the language is clear" in deciding whether a contract term is ambiguous. New Valley Corp., 89 F.3d at 150 (quoting Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135 (3d Cir. 1993)). Instead a court must "consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation." Id. (quoting Teamsters Indus. Emps. Welfare Fund, 989 F.2d at 135).

Whether a contractual term is ambiguous is a question of law. See id. at 149. If we determine that a contractual term is ambiguous, "then the interpretation of that term is a question of fact for the trier of fact to resolve in light of the extrinsic evidence offered by the parties in support of their respective interpretations." Sanford Inv. Co. v. Ahlstrom Mach. Holdings, Inc., 198 F.3d 415, 421 (3d Cir. 1999). Extrinsic evidence "may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." New Valley Corp., 89 F.3d at 150 (quoting Teamsters Indus. Emps. Welfare Fund, 989 F.2d at 135); see also Sanford Inv. Co., 198 F.3d at 421.

[*21] C.    Analysis

With the foregoing in mind, we look to the wording the parties used to memorialize their agreement regarding petitioners' 2011 tax items and any adjustments thereto.  In doing so we consider the closing agreement as a whole and the context in which it was written.

Paragraph 4 of the closing agreement is the only provision that addresses petitioners' eligibility for the 2011 FTC.  It states:  "During tax years 2003 through 2011, Taxpayer was entitled to foreign tax credit under section 901 of the Internal Revenue Code for foreign income taxes paid or accrued to a foreign country or U.S. possession."  Although paragraph 4 confirms petitioners' FTC eligibility for 2003 through 2011, it does not specify the allowable amounts.

The allowable amounts are partially addressed in paragraph 3, which states that petitioners "paid or accrued foreign income taxes to Italy and various other countries eligible for foreign tax credit under section 901".  Thereafter a table specifies amounts of "Foreign income taxes paid or accrued" for 2003 through 2010.  There are no entries in the table for 2011.

When read together, and bearing in mind respondent's acknowledgment that petitioners have an FTC of at least $2,165 for 2011, the above-described paragraphs establish an agreement that petitioners are entitled to an FTC of an

**[\*22]** unstated amount for that year.  The question becomes, then, whether those provisions reflect (i) an agreement not to adjust petitioners' reported 2011 FTC, as petitioners contend, or (ii) the lack of an agreement about the 2011 FTC, as respondent contends.  We find other provisions of the closing agreement helpful in answering that question.

Paragraph 8 states that the agreement "does not prevent" the IRS from proposing adjustments "unrelated to offshore financial arrangements."  The agreement "also does not prevent" the IRS from proposing adjustments "related to offshore financial arrangements not included" in petitioners' "voluntary disclosure referred to" in paragraph 1 thereof.  A clause after the numbered paragraphs states that "[t]his agreement is final and conclusive" except in the event of fraud, malfeasance, misrepresentation of material fact, or other occurrences not here relevant.

When read together, these provisions reflect an intention to accord finality to the tax consequences stemming from petitioners' income items that they disclosed except those "unrelated to offshore financial arrangements" or "related to offshore financial arrangements not included in" petitioners' "voluntary

**[\*23]** disclosure". Thus, unless petitioners' 2011 FTC falls in either of those excepted categories, the closing agreement precludes the determined deficiency.[13]

Respondent summarily suggests that the 2011 FTC was "unrelated to offshore financial arrangements". We disagree. Petitioners' 2011 FTC was clearly "related to offshore financial arrangements", given that petitioners' claim for the credit arose from their payment of foreign income tax on foreign-source income. Thus, our focus turns to whether the 2011 FTC was "related to offshore financial arrangements not included in" petitioners' "voluntary disclosure".

Respondent argues that the 2011 FTC was "not included" in petitioners' "voluntary disclosure". Respondent also argues that, even if the 2011 FTC was "included" in petitioners' "voluntary disclosure", a subsequent adjustment to that item is nevertheless permissible.

We disagree and address each of respondent's arguments in turn.

---

[13] The maxim expressio unius est exclusio alterius, meaning that to express or include one thing implies the exclusion of the other, or of the alternative, applies. See Coca-Cola Co. v. Commissioner, 155 T.C. __, __ (slip op. at 97) (Nov. 18, 2020) ("[W]here the specificity and apparent comprehensiveness of an agreement's enumeration of a category of things * * * implies that things not enumerated are excluded, we will apply the canon expressio unius est exclusio alterius." (quoting BMC Software, Inc. v. Commissioner, 780 F.3d 669, 676 (5th Cir. 2015), rev'g on other grounds 141 T.C. 224 (2013))); see also Summitt v. Commissioner, 134 T.C. 248, 265 n.14 (2010).

**[*24]**     1.     <u>"Not Included" in Petitioners' "Voluntary Disclosure"</u>

Respondent asserts that the "voluntary disclosure" referred to in paragraph 1 of the closing agreement identifies unreported income and overstated deductions only. The embedded table in that paragraph contains just two adjustments for 2011--a negative adjustment to ordinary dividends and a positive adjustment to pension income. According to respondent, those are the only adjustments deserving of finality for 2011. We disagree.

We read the agreement to provide that the parties intended to accord finality to petitioners' additional tax liabilities (including penalties and additions to tax) arising from their disclosure of foreign-source income and assets for 2003 through 2011. Although paragraph 1 identifies only adjustments to income with respect to 2011, it also states that "[t]his agreement applies to * * * [petitioners'] <u>additional tax liability</u> relating to * * * [their] voluntary disclosure of foreign source assets and income". (Emphasis added.) This provision echoes the recitals, which express an intention "to resolve for 2003 through 2011 the proper amount of federal income taxes" flowing from petitioners' voluntary disclosure of unreported offshore income and assets.

Given this intention, we conclude that the 2011 FTC related to petitioners' offshore financial arrangements that they voluntarily disclosed to respondent in

**[\*25]** that the FTC pertained to their foreign-source income, was addressed in the closing agreement, and affected the calculation of their additional tax liabilities. In that vein the FTCs for 2003 through 2011 arose from petitioners' payment of foreign income tax on foreign-source income, and petitioners' disclosure of that income was the heart of the closing agreement. In addition, as to 2011, the agreement states that petitioners were entitled to claim an FTC for 2011, and that credit affects the calculation of petitioners' additional tax liability for that year.

Respondent's attempt to limit the scope of the agreement to the adjustments in paragraph 1 also would render other paragraphs in the closing agreement meaningless. For example, in paragraph 2 petitioners agree that they were liable for accuracy-related penalties and additions to tax for 2003 through 2011. It would strain credulity to argue that the penalties and additions to tax agreed upon in that paragraph are not binding for 2011. Yet that is essentially what respondent is asking this Court to do with respect to the 2011 FTC. We decline to do so.

Furthermore, even assuming arguendo that the scope of the closing agreement is ambiguous, extrinsic evidence in the record supports our interpretation. In connection with their entry into the OVDP, petitioners submitted Forms 1040X for 2003 through 2011. Each Form 1040X included an upward adjustment to petitioners' FTC. For 2011 that upward adjustment was $123.

**[\*26]** The additional FTCs claimed on the Forms 1040X were an item of dispute between the parties, given that respondent did not accept the Forms 1040X as filed and proposed lesser FTCs in the May-15 RAR. We infer from these facts that FTCs for 2003 through 2011 were an integral part of the parties' negotiations relating to the voluntary disclosure. Accordingly, the 2011 FTC was an item to which the parties intended to accord finality.

### 2. Absence of Agreed-Upon Amount

Respondent argues that, even if the 2011 FTC was within the scope of the closing agreement, a subsequent adjustment to that item is still permissible. According to respondent, the parties' failure to specify the allowable amount of the 2011 FTC indicates that they never reached an agreement as to that item. Such an interpretation, however, would nullify the closing agreement's provision that it is "final and conclusive" as to those items within its coverage. Paragraph 4 states that petitioners were "entitled" to FTCs "[d]uring tax years 2003 through 2011". If petitioners were "entitled" to an FTC for 2011, they must have been entitled to an FTC of some amount. The parties' failure to specify that amount does not mean there was no agreement concerning the 2011 FTC.

To be sure, there is uncertainty concerning the amount of FTC to which the parties agreed petitioners were entitled for 2011. While the closing agreement

[*27] specifies amounts of "[f]oreign income taxes paid or accrued" for 2003 through 2010, it does not do so for 2011. From extrinsic evidence in the record, we decipher three possible amounts: (1) $14,156, the amount petitioners claimed on their Form 1040; (2) $14,279, the amount petitioners claimed on their Form 1040X; or (3) $2,165, the amount RA Young proposed in the May-15 RAR, upon which petitioners based their June 11, 2015, payment.

We first consider the last of the above options, $2,165--which RA Young proposed in the May-15 RAR. Given that petitioners used the May-15 RAR to calculate their June 11, 2015, payment, they seemingly agreed with RA Young's proposed adjustment. We could therefore view petitioners' payment as extrinsic evidence that $2,165 was the agreed amount in the closing agreement. However, respondent has not advanced this argument. We therefore deem the argument waived and eliminate that amount as a possibility.

We are left with the amounts reported on the Form 1040 and Form 1040X. Because respondent did not accept the Form 1040X as filed, the adjustments in the closing agreement relate back to the original Form 1040. The closing agreement allowed petitioners an FTC for 2011 but made no adjustment to that item. We infer from the absence of an adjustment that the parties agreed to the amount shown on the original return, $14,156.

**[*28]** IV.    <u>Conclusion</u>

The closing agreement precludes the determined deficiency, which was based on an adjustment to a credit that the agreement had allowed in full. Accordingly, petitioners' June 11, 2015, payment and February 21, 2017, deposit resulted in an overpayment.[14]  Since we do not sustain the deficiency in tax that respondent determined, penalties do not apply in this case.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.

---

[14]  We will require a Rule 155 computation to determine the amount of the overpayment.